UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIK CASTLE, Individually and on Behalf of<br>All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>     vs.<br><br>COINBASE GLOBAL, INC., et al.,<br><br>                  Defendants. | Civ. Action No. 2:24-cv-04850-JHS<br><br>CLASS ACTION<br><br>CONSOLIDATED COMPLAINT FOR<br>VIOLATIONS OF THE FEDERAL<br>SECURITIES LAWS<br><br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ................................................................................1

II.   INTRODUCTION ...............................................................................................2

III.  JURISDICTION AND VENUE ..........................................................................5

IV.   THE PARTIES.....................................................................................................6

    A.    The Plaintiffs...........................................................................................6

    B.    The Corporate Defendant.........................................................................6

    C.    The Individual Defendants.......................................................................7

V.    BACKGROUND ...............................................................................................10

    A.    Coinbase's Business and KYC/AML Regulations ...............................10

    B.    The Consent Order Between the New York Department of Financial
          Services and Coinbase ...........................................................................14

          1.    Overview of New York Department of Financial Services'
               Investigation of Coinbase .........................................................14

          2.    Key Findings from the Department's Investigation...................16

    C.    The United Kingdom Financial Conduct Authority's Enforcement Action
          Against CBPL .........................................................................................22

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
      AND OMISSIONS ............................................................................................27

    A.    April 14, 2021 Registration Statement...................................................27

    B.    May 13, 2021 Quarterly Report on Form 10-Q .....................................29

    C.    June 25, 2021 Public Statement .............................................................31

    D.    August 11, 2021 Quarterly Report on Form 10-Q .................................31

    E.    November 10, 2021 Quarterly Report on Form 10-Q.............................33

    F.    December 8, 2021 Testimony Before the U.S. House Committee on
          Financial Services ..................................................................................35

    G.    February 25, 2022 Annual Report on Form 10-K...................................38

Page

    H.     March 9, 2022 Morgan Stanley Technology, Media, and Telecom Conference ...............................................................................................41

    I.      May 10, 2022 Quarterly Report Filed on Form 10-Q ..............................41

    J.      August 9, 2022 Quarterly Report Filed on Form 10-Q .............................43

    K.    November 1, 2022 Letter to the United States Department of the Treasury ........44

    L.     November 3, 2022 Quarterly Report Filed on Form 10-Q ....................................45

    M.   January 4, 2023 Statement Regarding the Company's Settlement with the New York State Department of Financial Services ..............................................50

    N.    February 21, 2023 Earnings Call and Annual Report on Form 10-K ...................50

    O.    March 8, 2023 Morgan Stanley Technology, Media & Telecom Conference ...............................................................................................55

    P.     May 4, 2023 Quarterly Report filed on Form 10-Q ................................56

    Q.    June 6, 2023 Testimony Before the U.S. House Committee on Agriculture .........57

    R.    August 3, 2023 Quarterly Report Filed on Form 10-Q .........................................57

    S.     October 10, 2023 Post on X.com ................................................................59

    T.     November 2, 2023 Quarterly Report Filed on Form 10-Q ....................................59

    U.    December 6, 2023 Goldman Sachs Financial Services Conference .....................61

    V.     February 15, 2024 Earnings Call and Annual Report on Form 10-K ...................61

    W.   February 15, 2024 Testimony Before the U.S. House Committee on Financial Services ......................................................................................65

    X.     March 6, 2024 Morgan Stanley Technology, Media & Telecom Conference ...............................................................................................66

    Y.     May 2, 2024 Quarterly Report Filed on Form 10-Q ..............................66

    Z.     May 21, 2024 JP Morgan Global Technology, Media and Communications Conference ...............................................................68

VII.    ADDITIONAL SCIENTER ALLEGATIONS .................................................................71

    A.    Financial Regulators Repeatedly Notified Defendants that Coinbase was Violating KYC/AML Regulations ........................................................71

1.      The New York State Department of Financial Services Communicated Frequently with the Company Regarding Its AML/KYC Deficiencies Under New York State Law ..............................................................71

2.      The UK Financial Conduct Authority Also Repeatedly Notified Defendants that Coinbase Was Violating British KYC/AML Regulations ..........73

B.      The Individual Defendants' Nearly $1.3 Billion Insider Sales ............................74

C.      Defendants Understood and Repeatedly Emphasized the Importance of Complying with AML/KYC Regulations to Coinbase's Business ......................81

VIII.   LOSS CAUSATION ..........................................................................................................83

A.      February 24, 2022 Disclosure ..............................................................................84

B.      January 4, 2023 Disclosure ..................................................................................85

C.      July 25, 2024 Disclosure ......................................................................................87

IX.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE ......................................................................89

X.      INAPPLICABILITY OF SAFE HARBOR ......................................................................90

XI.     CLASS ACTION ALLEGATIONS ..................................................................................91

XII.    CLAIMS FOR RELIEF .....................................................................................................93

COUNT I .............................................................................................................................93

For Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Coinbase, Armstrong, Haas, Choi, Chatterjee, Grewal, Jones and Rabenn ..............................................................93

COUNT II ............................................................................................................................95

For Violations of §20(a) of the Exchange Act Against Coinbase, Armstrong, Haas, Choi, Chatterjee, Grewal, Jones and Rabenn ..........................95

COUNT III ...........................................................................................................................97

For Violations of §20A Against Coinbase, Armstrong, Haas, Choi, Chatterjee, Grewal, and Jones ................................................................................97

XIII.   PRAYER FOR RELIEF ..................................................................................................100

XIV.    JURY DEMAND .............................................................................................................100

**Page**

4904-0075-6784.v1

Lead Plaintiffs Kendall J. Behnke and Peter W. Galla ("Lead Plaintiffs" or "Plaintiffs"), by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint"), allege the following upon knowledge as to their own acts, and upon the investigation conducted by Plaintiffs' counsel as detailed below.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons and entities who purchased and/or otherwise acquired Coinbase Global, Inc. ("Coinbase" or the "Company") securities between April 14, 2021 and July 25, 2024, inclusive (the "Class Period") and were damaged by the conduct asserted herein (the "Class"), against: (i) Coinbase; (ii) Brian Armstrong ("Armstrong"); (iii) Alesia J. Haas ("Haas"); (iv) Emilie Choi ("Choi"); (v) Surojit Chatterjee ("Chatterjee"); (vi) Paul Grewal ("Grewal"); (vii) Jennifer Jones ("Jones"); and (viii) Grant Rabenn ("Rabenn") (collectively, "Defendants"), for violations of §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and United States Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.     Plaintiffs' information and belief are based on, among other things, the independent investigation of Counsel.  This investigation includes, but is not limited to, a review and analysis of, *inter alia*: (i) public filings by Coinbase with the SEC; (ii) press releases, media statements, and marketing presentations issued and disseminated by the Company; (iii) statements by Coinbase's senior management to analysts and investors during the Company's conferences, television interviews, and on social media; (iv) analyst and industry reports concerning Coinbase; and (v) other public information and data regarding Coinbase.  Plaintiffs believe that substantial additional

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.   INTRODUCTION

3.      Coinbase operates one of the largest crypto asset trading platforms in the world, a virtual marketplace for the buying and selling of crypto assets such as Bitcoin, Ethereum, and Solana.  The digital nature and ease of transfer of cryptocurrency make it a preferred currency for criminals.  As a centralized exchange and financial institution, Coinbase was required to comply with important rules and regulations designed to prevent criminals from using Coinbase for money laundering and other illegal acts.  Throughout the Class Period, Defendants falsely represented that Coinbase was committed to compliance with applicable laws and regulations and to the prevention of illegal activities and fraud on its platform.

4.      Unbeknownst to investors, however, Coinbase failed to implement and maintain an effective anti-money laundering ("AML") program, and disregarded crucial Know Your Customer ("KYC") rules and regulations.  Plaintiffs' claims arise out of a fraudulent course of conduct in which Defendants misrepresented to investors that Coinbase was dedicated to, and was, fully complying with all laws and regulations in the jurisdictions where it operates regarding the verification of its customers' identities and the prevention of illegal activities, including KYC and AML laws and regulations.

5.      Throughout the Class Period, Defendants claimed that a strong compliance foundation was critical to the Company's success, and to its stated mission of "being the most trusted crypto platform."  Defendants repeatedly emphasized the importance of the Company's regulatory compliance, and touted Coinbase's strong reputation for compliance when compared to other, less trustworthy cryptocurrency exchanges.  Indeed, from Coinbase's first filing as a public company, Defendants have emphasized that Coinbase's platform charges a premium for the trust it has created.

- 2 -

For example, as defendant Armstrong stated in a letter to investors at the time of the Company's initial public offering, Coinbase "may not always move the fastest, or offer the lowest prices, but if we accomplish our goal of being the most trusted and easy to use, customers will continue to choose our products and services now and in the future." Thus, the Defendants knew Coinbase's success was directly connected to its reputation and ability to comply with domestic and international regulations.

6.      Defendants repeatedly assured investors that Coinbase was doing everything possible to comply with AML and KYC requirements, and that its methods of ensuring compliance had been successful. For example, the Company stated on its website during the Class Period:

> Trust is foundational to our work and we have developed sophisticated compliance tools to meet global regulatory requirements. ***Adhering to global and local regulations, including those related to anti-money laundering, is a core part of our business***. Combined with holding a high standard for who has access to our products, we've been able to create an ecosystem of trust. Our identity verification (IDV) platform is a critical component of our overarching know-your-customer (KYC) program and is designed to accurately verify that users are who they say they are."[1]

7.      Similarly, in a Class Period press release, the Company told investors that Coinbase's "goal has always been and will always be to build the most trusted, compliant, and secure crypto exchange in the world. Our customers deserve nothing less."

8.      Despite assuring investors that the Company's regulatory compliance was critical to Coinbase's success and a key focus of management, Defendants knowingly concealed that the Company flouted AML and KYC laws and regulations prior to and throughout the Class Period, allowing thousands of users to abuse the Company's platform to hide their identities, launder cryptocurrency and commit other illegal acts, and that the Company was under constant, active

---

[1]      https://www.coinbase.com/blog/identity-verification-and-financial-compliance.

investigation by New York and United Kingdom regulators for a number of "serious" compliance violations.

9.      Defendants' materially false and misleading statements and omissions about Coinbase's failure to comply with KYC and AML rules and regulations caused the price of Coinbase common stock to be artificially inflated. While Defendants hid Coinbase's compliance failures from the public, Coinbase insiders cashed in, selling over $1.3 billion of their Coinbase stock at artificially inflated prices as high as $424.88 per share.

10.      The truth first began to emerge on February 25, 2022, when Coinbase disclosed that the Company was under investigation by the New York State Department of Financial Services ("NYDFS" or the "Department"). On January 4, 2023, the Department announced Coinbase had entered into a consent order with the Department, under which the Company agreed to pay a $50 million civil penalty and spend an additional $50 million on upgrading its KYC/AML compliance program (the "Consent Order"). The Consent Order disclosed that the Department uncovered, and reported to Coinbase's senior management, numerous serious and ongoing deficiencies in Coinbase's compliance function, which Defendants repeatedly failed to remedy. As the Consent Order describes, in May 2020, "the Department conducted a safety and soundness examination of Coinbase for the period from July 1, 2018 through December 31, 2019" (the "Examination"), which identified "***serious deficiencies*** in Coinbase's compliance function across multiple areas" "including its Know-Your-Customer/Customer Due Diligence ("KYC/CDD") procedures, its Transaction Monitoring System ("TMS"), and its OFAC screening program." The Department also found "that Coinbase failed to conduct adequate annual AML risk assessments since 2017, Coinbase had not provided evidence of a validation review of its TMS system, and that the Department had transmitted a "report detailing the results of [the] examination . . . to Coinbase's leadership in September 2020."

11.     Then, on July 25, 2024, approximately eighteen months after the New York State Consent Order, the United Kingdom's financial regulator, the Financial Conduct Authority (the "FCA" or the "Authority"), published a press release publicly describing for the first time a similar enforcement action against Coinbase's UK-based subsidiary, CB Payments Limited ("CB Payments" or "CBPL"). The press release revealed that CBPL had entered "into a voluntary requirement (the VREQ) in October 2020, which followed *significant engagement* with the FCA relating to concerns about the effectiveness of CBPL's financial crime control framework." According to the FCA press release, CBPL repeatedly breached its October 2020 VREQ (defined below) with the FCA, stating:

> Despite the restrictions in place, CBPL onboarded and/or provided e-money services to 13,416 high-risk customers. Approximately 31 percent of these customers deposited around USD $24.9 million. These funds were used to make withdrawals and then execute multiple cryptoasset transactions via other Coinbase Group entities, totaling approximately USD $226 million.

12.     As a result of these disclosures on July 25, 2024, the price of Coinbase common stock declined by over 5% on trading volume of nearly 8.4 million shares. By the end of the Class Period, the price of Coinbase common stock closed at less than $232 per share, down from a Class Period high of $330 per share.

## III.     JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§10(b), 20A, and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t-l, and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendants conducted substantial economic activity in the District. As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

16.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    THE PARTIES

### A.    The Plaintiffs

17.    Co-Lead Plaintiff Kendall J. Behnke ("Behnke") is an individual who, as set forth in the certifications incorporated by reference herein (ECF 13-4), purchased and/or otherwise acquired shares of Coinbase common stock during the Class Period and was damaged thereby.

18.    Co-Lead Plaintiff Peter W. Galla ("Galla") is an individual who, as set forth in the certifications incorporated by reference herein (ECF 13-4), purchased and/or otherwise acquired shares of Coinbase common stock during the Class Period and was damaged thereby.

### B.    The Corporate Defendant

19.    Defendant Coinbase Global, Inc. is a Delaware corporation that operates an exchange platform for cryptocurrency assets.  Coinbase's stock is registered and trades on the National Association of Securities Dealers Automatic Quotation System ("NASDAQ") under the ticker symbol "COIN."  Coinbase, Inc. is a wholly-owned subsidiary of Coinbase, and, together with several other subsidiaries, comprises the Company's principal asset.  Coinbase is a "remote-first" business, and thus has no physical headquarters or principal place of business.

20.    Relevant non-party Coinbase Payments, Ltd. is a subsidiary of Coinbase Global, Inc. registered to do business in the United Kingdom.  CBPL facilitates fiat transactions for UK-based customers, including retail users and financial institutions, through which those customers can create accounts and add traditional currency to wallets that can be used to make transactions through other entities within the Coinbase Group.  Thus, while CBPL does not operate as a brokerage or exchange where customers can buy or sell cryptocurrencies, it serves as an entry-point for UK-based Coinbase

- 6 -

customers to access the cryptocurrency markets. In that capacity, CBPL manages the onboarding and account creation processes for new UK-based customers, which includes the critical function of vetting those users in compliance with AML and KYC laws and regulations.

### C.    The Individual Defendants

21.    Defendant Brian Armstrong served at all relevant times as Coinbase's Chief Executive Officer ("CEO") and the Chairman of its Board of Directors ("Board"). Armstrong co-founded Coinbase in 2012, and has served as CEO since the Company's founding. Armstrong became the Chairman of the Board in February 2021. Defendant Armstrong served as a director of CBPL from July 2015 to May 2016. During the Class Period, Armstrong signed the Form S-1 Registration Statements filed with the SEC on February 25, 2021, March 17, 2021, and March 23, 2021, each of which were incorporated into and became a part of the Company's prospectus pursuant to Rule 424(b)(4) filed with the SEC on April 14, 2021. Armstrong also signed each of the Company's quarterly and annual reports filed on Forms 10-Q and 10-K with the SEC during the Class Period. Armstrong spoke frequently to investors during earnings calls and conferences regarding Coinbase's purported compliance with AML and KYC regulations, including at: Coinbase's February 21, 2023 earnings call for Fiscal Year 2022; the March 8, 2023 Morgan Stanley Technology, Media & Telecom Conference; the June 7, 2023 Piper Sandler Global Exchange and Fintech Conference; and the March 6, 2024 Morgan Stanley Technology, Media & Telecom Conference.

22.    Defendant Alesia J. Haas served at all relevant times as Coinbase's Chief Financial Officer ("CFO"), a position she has held since joining the Company in April 2018. Defendant Haas has also served as a director of CB Payments since December 2018. During the Class Period, Haas signed the Form S-1 Registration Statements filed with the SEC on February 25, 2021, March 17, 2021, and March 23, 2021, each of which were incorporated into and became a part of the

- 7 -

Company's prospectus pursuant to Rule 424(b)(4) filed with the SEC on April 14, 2021. Haas also signed each of the Company's quarterly and annual reports filed on Forms 10-Q and 10-K with the SEC during the Class Period. Haas spoke frequently to investors during earnings calls and conferences regarding Coinbase's purported compliance with AML and KYC regulations, including at: the March 9, 2022 Morgan Stanley Technology, Media, and Telecom Conference; the December 6, 2023 Goldman Sachs Financial Services Conference; and the Company's February 15, 2024 earnings call for Fiscal Year 2023. Haas also testified before the U.S. House Committee on Financial Services regarding the Company's AML and KYC compliance on December 8, 2021.

23.    Defendant Emilie Choi served at all relevant times as Coinbase's President and Chief Operating Officer ("COO"), a position she has held since 2019. Previously, Choi served as the Company's Vice President of Business from 2018 to 2019. Choi spoke to investors during conferences and earnings calls regarding Coinbase's purported compliance with KYC and AML regulations, including at: Coinbase's February 21, 2023 earnings call for Fiscal Year 2022; and the May 21, 2024 JP Morgan Global Technology, Media and Communications Conference.

24.    Defendant Surojit Chatterjee served as Coinbase's Chief Product Officer ("CPO") at all relevant times starting in January 2020 through February 2023, when he voluntarily retired from the Company. Chatterjee made public statements on behalf of the Company regarding its purported compliance with AML and KYC regulations during a #ProductCon YouTube presentation on June 25, 2021.

25.    Defendant Paul Grewal served at all relevant times as Coinbase's Chief Legal Officer ("CLO") and Corporate Secretary, a position that he has held since August 2020, when he joined the Company. Defendant Grewal has also served as a director of CB Payments since March 2021. Prior to joining Coinbase, Grewal served as a U.S. Magistrate Judge for the U.S. District Court for the Northern District of California from December 2010 to June 2016. Grewal spoke to investors during

- 8 -

conferences and earnings calls regarding Coinbase's purported compliance with AML and KYC regulations, including at: the Company's February 21, 2023 earnings call for Fiscal Year 2022; and the June 12, 2023 Morgan Stanley US Financials, Payments, and CRE Conference.  On June 6, 2023, Grewal testified before the U.S. House Committee on Agriculture regarding the Company's compliance with AML and KYC regulations.

26.    Defendant Jennifer Jones served at all relevant times as Coinbase's Chief Accounting Officer ("CAO"), a position she has held since July 2018.  Jones signed all of the Company's annual reports filed with the SEC on Form 10-K during the Class Period.

27.    Defendant Grant Rabenn served as Coinbase's Director of Financial Crimes Legal from March 2021 until May 2024.  Starting in May 2024, Rabenn served as Director, Head of International Legal APAC/Americas/Africa through the end of the Class Period.  On February 15, 2024, Rabenn testified before the U.S. House Committee on Financial Services regarding Coinbase's compliance with AML and KYC regulations.

28.    Defendants Armstrong, Haas, Choi, Chatterjee, Grewal, Jones, and Rabenn are collectively referred to herein as the "Individual Defendants" and, together with Coinbase, the "Defendants."

29.    The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Coinbase's April 14, 2021 Registration Statement, quarterly reports, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's financial reports and press releases alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  The Individual Defendants, as senior executive officers of Coinbase and as further detailed herein, were privy to confidential and proprietary information concerning Coinbase.

- 9 -

The Individual Defendants had access to material, non-public information about the Company's business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings, and via reports and other information provided to them in connection therewith.

30.    Defendants Armstrong, Haas, Choi, Chatterjee, Grewal, and Jones, as members of Coinbase's senior management, were privy to confidential and proprietary information concerning Coinbase.  These Defendants had access to material, non-public adverse information about the Company's business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings, and via reports and other information provided to them in connection therewith.

## V.    BACKGROUND

### A.    Coinbase's Business and KYC/AML Regulations

31.    Coinbase was founded in 2012 by, among others, defendant Armstrong, who has served as the Company's CEO since its founding.  The Company operates one of the world's largest platforms for storing and trading crypto assets, including the original cryptocurrency, Bitcoin.  Since Bitcoin was created, hundreds of additional cryptocurrencies, coins, and various forms of "crypto assets" (*e.g.*, non-fungible tokens and cryptographic art) have joined the broader crypto asset market. Coinbase grew quickly along with the crypto industry at large, amassing a user base of over 40 million retail users and 7,000 institutions in over 100 countries within ten years of its founding, housing $90 billion of cryptocurrency assets on its platform by the time the Company went public in April 2021.  Coinbase makes money primarily through fees it charges its customers to deposit, store, trade, and withdraw those assets.

32.    The Company's customers create Coinbase account(s), which can be accessed through Coinbase's mobile phone apps or the Coinbase website, funding those accounts through

- 10 -

initial deposits of fiat currency (*e.g.*, U.S. dollars), and using the funds to purchase cryptocurrencies or crypto assets which are stored in the user's "wallet." Thus, Coinbase fulfills a role akin to a traditional consumer bank for holders and purchasers of cryptocurrencies and crypto assets, allowing customers to check their account balances in their "wallet" at any time. In addition to the Coinbase wallet's storage function, the Company's platform also provides transactional services, allowing users to buy, sell, and trade cryptocurrencies and crypto assets in exchange for either fiat currency - which can be withdrawn from the Coinbase wallet - or other cryptocurrencies and crypto assets. Thus, in addition to the platform's services fulfilling a role resembling a traditional consumer bank account, Coinbase's platform also acts as the functional equivalent of a stock or commodities exchange – providing potential buyers and sellers current market prices for the assets exchanged on the marketplace and charging fees for pairing those buyers and sellers and facilitating the transactions.

33.     A vital ingredient to Coinbase's ability to achieve its goal of being the "most trusted" crypto platform was implementing proper, compliant, and sufficient KYC and AML policies and procedures. Coinbase's primary function – in facilitating the purchase of crypto assets and transactions between Coinbase customers using those assets – is ripe for abuse by criminal individuals and organizations who want to avoid using traditional banks.

34.     Because of the pseudo-anonymous nature of crypto asset transactions, and ease with which international transactions can occur through crypto trading platforms, criminals and criminal organizations have shifted their money laundering tactics in recent years to, in many cases, replace traditional money laundering schemes with those involving crypto assets. Given the size of the markets for crypto assets, the fledgling nature of the technology and the prevalence with which crypto assets are used to hide or facilitate illegal activity, significant government and regulatory attention has been placed on understanding and regulating the crypto asset markets in recent years.

- 11 -

35.     As a result, regulators worldwide require companies like Coinbase to carefully monitor both the individuals who use their platforms as well as the transactions that are occurring on those platforms in order to detect and prevent the use of crypto to fund illegal enterprises – regulations commonly referred to as KYC and AML.  For example, during the account initiation process, anti-money laundering and know-your-customer regulations require that Coinbase verify customer information and perform a screening process designed to ensure that the customer using Coinbase's platform are not known criminals or criminal organizations or individuals subject to international financial sanctions, and to ensure that the funds, the sources thereof, and the use of the funds held in Coinbase accounts are not associated with or used to facilitate illegal activity.

36.     While testifying before Congress regarding the regulation of the crypto industry, Paul Grewal noted the importance of these regulations, and emphasized Coinbase's regulatory compliance:

> Coinbase is focused intently on the prevention and detection of illicit activity and keeping Coinbase customers and the U.S. financial system safe from bad actors.  We have implemented a comprehensive Financial Crimes Compliance program that adheres to U.S. [Bank Secrecy Act][2] / AML and sanctions requirements as is required under our existing licenses.

37.     As an international crypto exchange, Coinbase is subject to KYC and AML regulations both with respect to its operations in the United States and abroad.

38.     For example, and relevant to this Action, Coinbase was subject to the AML and KYC regulatory frameworks of both the New York Department of Financial Services, which provided Coinbase a license to engage in virtual currency activity and to act as a money transmitter in New

---

[2]    The purpose of the Bank Secrecy Act, passed by Congress in 1970, is to require "financial institutions to maintain appropriate records and file certain reports involving currency transactions and a financial institution's customer relationships [in order to assist the government with] criminal, tax, or regulatory investigations or proceedings." https://www.fdic.gov/resources/supervision-and-examinations/examination-policies-manual/section8-1.pdf.

4904-0075-6784.v1

York State starting in 2017, as well as the AML and KYC regulatory framework of the Financial

Conduct Authority, an independent financial regulator in the United Kingdom.

39.     Under its license issued by the New York Department of Financial Services, Coinbase

was required to, *inter alia*:

> [NYCRR Title 23 §200.15(b):] [Establish an AML program based on a] risk assessment that will consider legal, compliance, financial, and reputational risks associated with the licensee's activities, services, customers, counterparties, and geographic location . . . .
>
> \*          \*          \*
>
> [NYCRR Title 23 §200.15(h):] [M]aintain, as part of its anti-money laundering program, a customer identification program. . . .  [And] at a minimum, verify the customer's identity, to the extent reasonable and practicable, maintain records of the information used to verify such identity, including name, physical address, and other identifying information, and check customers against the Specially Designated Nationals ("SDNs") list maintained by the [Office of Foreign Assets Control]. . . . [Furthermore], for accounts involving foreign entities, licensees must establish enhanced due diligence policies, procedures, and controls to detect money laundering, including assessing the risk presented by such accounts based on the nature of the foreign business, the type and purpose of the activity, and the anti-money laundering and supervisory regime of the foreign jurisdiction.

40.     The purpose of these regulations is to "ensure[] the safety and soundness of New

York's financial services industry and [to] promot[e] the reduction and elimination of fraud, abuse,

and unethical conduct with respect to financial institutions licensed in the state.

41.     The FCA, likewise, imposes similar safety and security requirements.  In July 2020,

the FCA, in response to weaknesses identified in the e-money sector, required firms, like Coinbase,

to implement "robust frameworks and governance and consider the financial crime risk posed by

innovative products. . . ."  The FCA's regulations require crypto companies to, *inter alia*,:

> [T]ake appropriate steps to identify and assess the risks of money laundering, proliferation financing and terrorist financing, which the business is subject to[;]
>
> \*          \*          \*

- 13 -

[H]ave in place policies, systems and controls appropriate to mitigate the risk of the business being used for the purposes of money laundering, terrorist financing and proliferation financing[;]

\*       \*       \*

[U]ndertake customer due diligence when entering into a business relationship or occasional transactions[;]

\*       \*       \*

[A]pply more intrusive due diligence, known as enhanced due diligence, when dealing with customers who may present a higher money laundering, terrorist financing and proliferation risk . . . [; and]

\*       \*       \*

[U]ndertake ongoing monitoring of all customers to ensure that transactions are consistent with the business's knowledge of its customer, the customer's business and risk profile[.][3]

**B.      The Consent Order Between the New York Department of Financial Services and Coinbase**

**1.      Overview of New York Department of Financial Services' Investigation of Coinbase**

42.      In January 2023, Coinbase entered into a Consent Order with the New York Department of Financial Services (the "Department") in which Coinbase agreed to pay a civil monetary penalty of $50 million and spend an additional $50 million on upgrading its compliance program to resolve various compliance deficiencies identified by the Department.  As detailed in the Consent Order and described below, the Department uncovered numerous significant and ongoing deficiencies in Coinbase's compliance function that Defendants repeatedly failed to remedy, despite being directed to do so on several occasions.  Though Coinbase entered into the Consent Order in January 2023, the Department actually notified Coinbase of series deficiencies in its compliance function much earlier – in May 2020.  As the Consent Order describes, in May 2020, "the Department conducted a safety and soundness examination of Coinbase for the period July 1, 2018

---

[3]      https://www.fca.org.uk/firms/financial-crime/cryptoassets-aml-ctf-regime.

through December 31, 2019" (the "Examination"), which identified "***serious deficiencies*** in Coinbase's compliance function across multiple areas," "including its Know-Your-Customer/Customer Due Diligence ("KYC/CDD") procedures, its Transaction Monitoring System ("TMS"), and its OFAC screening program." The Department also found "that Coinbase failed to conduct adequate annual Anti-Money Laundering ("AML") risk assessments since 2017, as required by 23 NY[CRR] 200.15(b), and that Coinbase had not provided evidence of a validation review of its TMS system, as required by 23 NYCRR 504.3(a)." The Department transmitted a "Report of Examination (the "ROE") detailing the results of [the] examination . . . to Coinbase's leadership in September 2020."

43.    As a result of the Examination's findings, "Coinbase made commitments to the Department to improve its BSA/AML and OFAC compliance programs, including engaging an Independent Consultant." Coinbase worked with the Independent Consultant to develop "a remediation plan and took steps toward improving its Compliance Program."

44.    The Consent Order further describes that, "[i]n 2021, the Department also began an enforcement investigation to determine whether legal violations had occurred as a result of Coinbase's compliance deficiencies." Again, "[t]he Department's investigation uncovered substantial lapses in Coinbase's KYC/CDD program, its TMS, and in its AML and OFAC sanctions controls systems, as well as issues concerning Coinbase's retention of books and records, and with respect to meeting certain of its reporting obligations to the Department."

45.    According to the Consent Order, Coinbase took "certain steps to remediate the issues identified by the Department and the Independent Consultant" in late 2020 and in 2021:

> However, substantial weaknesses remained, and, over the course of 2021, it became clear that Coinbase's compliance system was inadequate to handle the growing volume of Coinbase's business, a situation that was exacerbated by tremendous growth in its customer base.

- 15 -

Indeed, during the course of the Department's investigation, the compliance situation inside Coinbase reached a critical stage. ***By the end of 2021, Coinbase had a backlog of unreviewed transaction monitoring alerts [of] more than 100,000 (many of which were months old), and the backlog of customers requiring enhanced due diligence ("EDD") exceeded 14,000***.

These backlogs were exacerbated by business and operational growth occurring in 2020 through 2021. For example, Coinbase customer sign ups in May 2021 were fifteen times January 2020 levels, and monthly transactions in November 2021 were twenty-five times January 2020 levels.

46. Because of the substantial compliance weaknesses that remained:

"Department determined that the Coinbase compliance program required further intervention. . . . [A]nd, pursuant to an MOU entered into with Coinbase on February 10, 2022, the Department required that the Company retain an Independent Monitor, to be selected by the Department, to assess the current status of Coinbase's Compliance Program and to assist the Company in addressing deficiencies"

"In August 2022, the Independent Monitor issued the Monitor Report on the state of Coinbase's compliance program finding that, although Coinbase had made some progress in remediating its compliance issues, certain deficiencies persisted."

47. According to the January 2023 Consent Order, "[i]n response, Coinbase developed with the Independent Monitor an additional targeted remediation plan," and Coinbase's efforts to implement that plan were "ongoing."

## 2. Key Findings from the Department's Investigation

48. As described in the Consent Order, "[t]he most serious noncompliance concerns" identified by the Department "concern[ed] Coinbase's [Money Laundering/Terrorist Financing] compliance program," which the Department found were "known to Coinbase since at least 2018, flagged through both internal assessments and external reviews . . . ." The Department also found severe failings that involved Coinbase's KYC/CDD program, which the Department described as immature and inadequate." Ultimately, the Department concluded that "Coinbase treated customer onboarding requirements as a simple check-the-box exercise and failed to conduct appropriate due diligence[,]" and provided numerous examples of Coinbase's customer due diligence failures, including:

- 16 -

(a)      Prior to December 2020, Coinbase often failed to assign an informed "risk rating" to individual retail customers at the time of onboarding, and no quality assurance process was in place concerning risk rating until September 2021;

(b)      Coinbase's customer due diligence file from its retail customers historically consisted of little more than a copy of a photo ID;

(c)      Coinbase historically did the bare minimum to verify customer due diligence information for customers, relying on self-reported social media profiles while overlooking information that was, on its face, clearly inaccurate, and/or incomplete;

(d)      Prior to July 2021, Coinbase allowed customers to open accounts without supplying essential information such as annual expected activity, and account purpose;

(e)      Coinbase failed to timely conduct enhanced due diligence ("EDD") on high-risk customers and for a time had a substantial backlog of open EDD cases as of July 11, 2022, for example, there were over 10,000 cases in the backlog for Coinbase and its affiliates; and

(f)      Coinbase's analysts, when they historically performed EDD, often asked for the bare minimum of identifying documents, conducted only a cursory review of the material provided, and at times accepted responses that were either non- or partially- responsive.

49.      As the Department concluded in the Consent Order, "Coinbase's lack of knowledge about its customers exposed the Company and the financial system to increased ML/TF risk."  The Consent Order explained further that:

> Coinbase's compliance program is "risk-based," that is, the amount of scrutiny an account or transaction is given depends upon the risk rating assigned to the account. Such a risk-based system, however, is only effective if the risk rating is conducted rationally, ***and that simply did not happen at Coinbase*** (and in many cases still has not happened) for accounts opened prior to December 2020.

50.    The Consent Order explained, "[t]he risks to the financial system due to this weakness are not merely theoretical, but have already resulted in suspicious or unlawful conduct being facilitated through Coinbase's platform," including:

For example, the Department's investigation identified issues with a former Coinbase customer who was criminally charged in the 1990s with crimes related to child sexual abuse material ("CSAM"). This publicly available information was not discovered by Coinbase at the time of onboarding, and thus the customer was not designated as high risk and no specially tailored controls or restrictions were imposed. *For more than two years, this customer engaged in suspicious transactions potentially associated with illicit activity without detection by Coinbase*. Coinbase eventually detected the activity, reported it, and closed the accounts. Coinbase cooperated with law enforcement with respect to this matter.

In another example, in the spring of 2021, an individual purporting to be an employee of a corporation ("Corporation A") was able to open an account on behalf of Corporation A without authorization from that corporation, and without the appropriate personal identification documentation required by Coinbase policy. As part of a sophisticated fraud, the individual was able to submit an online request form to raise the daily withdrawal limit by 50 times, which was granted despite a total lack of account activity and, therefore, no evidence that the existing thresholds were insufficient for the customer's activity. Then, on a single day, the employee transferred more than $150 million from Corporation A's bank account (that the employee had also gained unauthorized access to) into Corporation A's Coinbase account. The employee then immediately converted the fiat funds into virtual currency, then immediately moved the virtual currency to a wallet off the Coinbase platform. Coinbase did not become aware of this activity until six days later, when Coinbase was contacted by Corporation[] A['s] bank. Coinbase assisted with the investigation of law enforcement, which ultimately led to recovery of the funds.

51.    The Consent Order also described various deficiencies in Coinbase's Transaction Monitoring Systems, explaining:

Another bedrock ML/TF requirement is the maintenance of a transaction monitoring system ("TMS") sufficient to monitor customers' transactions, and to track, timely investigate, and appropriately address, any suspicious activity occurring on the institution's platform. Pursuant to Part 504 of the Superintendent's Regulations, Department licensees are required to have a system in place for monitoring transactions after their execution for potential ML/TF violations and suspicious activity reporting.

Generally, transaction monitoring systems are programmed to trigger an alert on certain elements of potentially suspicious transactions, which are then reviewed by specially trained compliance professionals who analyze the transaction involved in the alert. For example, TMS systems are commonly programmed to alert

- 18 -

compliance personnel when a customer who normally transacts in low quantities suddenly begins transacting in much higher quantities. Other relevant factors include risk ratings, which in turn could impact certain triggering "thresholds" of the system. Thus, a low-risk customer may transact in higher amounts under certain scenarios without triggering an alert whereas an alert would be triggered for a similarly situated high-risk customer.

As previously discussed, Coinbase's business and customer base have grown exponentially since it was licensed by the Department, but Coinbase was unable to keep pace with the growth in the volume of alerts generated by its TMS. *By late 2021, Coinbase's failure to keep pace with its alerts resulted in a significant and growing backlog of over 100,000 unreviewed transaction monitoring alerts*.

The TMS alert backlog was caused, in substantial part, by *Coinbase's inability to predict or manage the growing alert volume and a lack of adequate compliance staff*.

Coinbase's efforts to remediate this backlog encountered numerous challenges. In late 2021, Coinbase represented that it would be capable of clearing its TMS backlogs by the end of February 2022. As part of that effort, Coinbase hired more than one thousand third-party contractors to "burn through" the remainder of the backlog. At first, this approach appeared to have worked. In April 2022, Coinbase reported to the Department that the TMS backlog had been resolved.

*Coinbase provided insufficient oversight over the third-party contractors it hired, and a substantial portion of the alerts reviewed by third parties was rife with errors*. At the outset of the backlog burn down, in January and February 2022, the training Coinbase provided was not scalable for the size of the contractor force, and attendance at the training sessions was not adequately tracked. The quality control process was not always performed by the contractor organizations to the standards that Coinbase provided, and initially, *Coinbase did not have a system in place to audit the quality control that was done*.

By March 2022, Coinbase's Quality Assurance reviews revealed that there were serious quality issues with the work of certain outside contractors. As a result, in May 2022, Coinbase retained a third-party audit firm to review and quality check the work of three specific contractors who worked on the backlog. Those three problematic contractors together "cleared" approximately 73,000 TMS alerts.

In July 2022, the third-party audit firm reported to Coinbase that, based on its sampling, of the alerts cleared by the three contractors, *more than half failed the quality check. For one contractor, the failure rate was 96% in a sample of 186 alerts with respect to one kind of alert*. In July 2022, Coinbase decided to re-review the approximately 11,000 alerts cleared by that contractor.

Coinbase did not inform the Department of these issues until July 2022 notwithstanding that it was already subject to the February 2022 MOU with the Department.

- 19 -

In August 2022, after discussing the issue with the Independent Monitor, Coinbase decided it would also re-review the approximately 41,000 alerts cleared by another contractor that had a 73% failure rate in a sample with respect to one kind of alert.

*Because the TMS deficiencies prevented Coinbase from properly monitoring the activity of its customers, Coinbase faced an increased risk of abuse by bad actors*. Coinbase has since completed its first-level re-review of these alerts.

As with the customer due diligence deficiencies, this risk is not merely theoretical. Although the full extent of activity that was contained in Coinbase's TMS backlog has not been fully determined, *the Department has identified troubling examples of suspicious conduct that should have been identified, stopped, and (in some instances) reported to authorities but was not, at least initially, due to the backlog. This includes, among other things, examples of possible money laundering, suspected CSAM-related activity, and potential narcotics trafficking*.

One of the primary reasons for requiring a TMS is so that a financial institution can identify and prevent future suspicious transactions so that bad actors are not allowed to use a financial institution to facilitate illegal activity. Simply put, because of the backlogs, Coinbase's TMS system failed to sufficiently accomplish that goal.

52.     Additionally, the Consent Order detailed numerous Suspicious Activity Reporting

Deficiencies:

Financial institutions have the obligation to timely investigate and report to the Federal government any suspicious activity in the form of a SAR within 30 days of detection. *Another consequence of Coinbase's failed TMS discussed above is that, as uninvestigated TMS alerts languished for months in the backlog, Coinbase routinely failed to timely investigate and report suspicious activity as required by law*.

The Department's investigation found numerous examples of SARs filed months, some more than six months, after the suspicious activity was first known to Coinbase.

Furthermore, *the Department found that Coinbase's record keeping of suspicious activity investigations and reporting was insufficient*. For example, Coinbase was unable to meaningfully respond to the Department's request for data related to suspicious activity identification, tracking, and reporting that took place in 2018 and 2019 because it did not adequately track or retain that information.

53.     The Consent Order also documented numerous deficiencies in Coinbase's KYC and

PEP Screening:

The Financial Action Task Force ("FATF") is a global money laundering and terrorist financing watchdog that maintains lists of high-risk nations and persons. The FATF Politically Exposed Persons ("PEP") list is a list of individuals who are or have been entrusted with a prominent function. By virtue of their public position or relationships, PEPs may present a risk higher than other customers by having access to funds that may be the proceeds of corruption or other illicit activity. Certain PEPs have used financial institutions as conduits for their illegal activities, including corruption, bribery, money laundering, and other illicit financial activity. PEP designation is not itself an indicator of illegal activity, but should make financial institutions, including Coinbase, take a closer look at the transactions of the PEP. In practical terms, this may mean enhancing the risk rating of the customer in question.

While approximately 1,600 institutional customers were subject to sanctions and PEP screening at onboarding, they were not subject to ongoing sanctions or PEP screening until December 2020. According to Coinbase and consistent with FinCEN regulations, PEP screening is conducted on a risk basis. Coinbase conducts PEP screening for its customer relationships that pose the greatest risk for potential illicit activity, including for all related parties of U.S. institutional clients. Until that screening was complete, Coinbase was insufficiently aware of whether members of that customer base were at a higher risk for corruption, bribery, money laundering, and other illicit financial activity.

In addition to the SDN lists, OFAC maintains geographical sanctions against broad sectors of the economies of certain nations such as Iran, Cuba, Syria, Russia, and North Korea. Such prohibitions necessarily require a company like Coinbase to understand where its users are physically located. However, Coinbase allows its users to access its sites while using Virtual Private Networks ("VPNs") or The Onion Router ("TOR"). VPNs are a means of using a proxy web address as an interface between a user and a website. TOR disseminates web traffic across a distributed and anonymous network, such that the exit nodes for the network appear to be the user's web address. Both methods allow a user to appear to be located in a jurisdiction other than that of the user's actual, physical location.

Notably, Coinbase has never promulgated a risk-based policy (for instance, instituting a rule that use of such tools raises the level of risk from medium to high, or from low to medium) for those users it detects using such tools. Instead, Coinbase allows its investigators to consider such activity as a factor in investigations.

In sum, Coinbase knows there is technology widely available to circumvent geographic restrictions, knows that some of its customers use that technology, and has not structured its compliance program to fully account for the use of that technology, even if Coinbase does include certain mitigating controls addressing VPNs.

54.    As a result of the numerous, ongoing and serious deficiencies the Department identified in Coinbase's compliance function over a multi-year period, which Defendants failed to

remedy, despite being directed to do so repeatedly, the Department ultimately fined Coinbase $50 million and required that the Company spend an additional $50 million over two years to upgrade its compliance and remedy the numerous deficiencies identified by the Department, and to provide the Department with quarterly updates describing the Company's progress.

55.    On January 4, 2023, the same day that the Department announced the Consent Order, Coinbase released a statement by Grewal acknowledging the Consent Order and committing to re-doubling the Company's compliance efforts:

> Today's consent order includes a $50 million penalty. Coinbase has also committed to $50 million in compliance program investments over the next two years. We view this resolution as a critical step in our commitment to continuous improvement, our engagement with key regulators, and our push for greater compliance in the crypto space – for ourselves and others.

**C.    The United Kingdom Financial Conduct Authority's Enforcement Action Against CBPL**

56.    On July 25, 2024, approximately eighteen months after the Company disclosed that it was being investigated by New York State Department Financial Services, the United Kingdom's financial regulator, the Financial Conduct Authority, published a press release publicly describing for the first time a similar enforcement action against Coinbase's UK-based subsidiary, CB Payments Limited. Specifically, the July 25, 2024 press release disclosed that CBPL "has been fined £3,503,546 by the Financial Conduct Authority (FCA) for repeatedly breaching a requirement that prevented the firm from offering services to high-risk customers."

57.    The FCA press release further revealed that CBPL had entered "into a voluntary requirement (the VREQ) in October 2020, which followed significant engagement with the FCA relating to concerns about the effectiveness of CBPL's financial crime control framework." According to the FCA press release, the CBPL repeatedly breached its October 2020 VREQ with the FCA, stating:

Despite the restrictions in place, CBPL onboarded and/or provided e-money services to 13,416 high-risk customers. Approximately 31 percent of these customers deposited around USD $24.9 million. These funds were used to make withdrawals and then execute multiple cryptoasset transactions via other Coinbase Group entities, totaling approximately USD $226 million.

58. The FCA press release described, in detail, CBPL's breach of the VREQ, explaining that:

The breaches were the result of CBPL's lack of due skill, care and diligence in the design, testing, implementation and monitoring of the controls put in place to ensure that the VREQ was effective. This included failing to consider all of the various ways in which customers might be onboarded when designing the controls. Because of inadequacies in the initial monitoring of compliance with the VREQ, repeated and material breaches went undiscovered for almost two years.

59. The FCA press release also quoted a statement by Therese Chambers, the joint executive Director of Enforcement and Market Oversight at the FCA, regarding the gravity of CBPL's breaches of the VREQ:

The money laundering risks associated with crypto are obvious and firms must take them seriously. Firms like CBPL that enable crypto trading need to have strong financial crime controls. CBPL's controls had significant weaknesses and the FCA told it so, which is why the requirements were needed. CPBL, however, repeatedly breached those requirements.

This increased the risk that criminals could use CBPL to launder the proceeds of crime. We will not tolerate such laxity, which jeopardizes the integrity of our markets.

60. A Final Notice, dated July 23, 2024, was attached to the press release, which detailed the reasons for the fine (the "Final Notice"), including the below statement:

CBPL is an Authorized Electronic Money Institution ("AEMI"), with permission to issue electronic money ("e-money") and to provide payment services. It is part of the Coinbase Group, which operates a prominent cryptoasset trading platform that is accessible globally. CBPL does not undertake cryptoasset transactions for customers but it enables customers to deposit fiat currency into e-money wallets which can then be used to purchase and exchange cryptoassets via other entities within the Coinbase Group.

61. The Final Notice stated the following about cryptoassets, in order to provide background:

- 23 -

Cryptoassets provide a near-instant and low-cost way to transfer value across borders. Whilst the vast majority of cryptoasset transfers are conducted for valid purposes, they can be an attractive technological enabler for criminals seeking to launder funds. This is due to a number of factors including the pseudo-anonymous nature of cryptoassets and services, their accessibility online, and constant innovation offering new opportunities for criminals to exploit novel applications.

62. The Final Notice also explained CBPL's legal obligations as a financial institution:

As a financial institution, CBPL is required to identify and assess the risks of money laundering and terrorist financing to which its business is subject and to maintain controls to mitigate and manage effectively these risks. This includes compliance with the requirements of the MLR 2017 ["The Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017"]. The Authority is responsible for supervising CBPL and taking necessary measures to secure its compliance with these requirements.

63. The Final Notice described the Authority's initial findings into CBPL's financial

crime control framework:

During a visit to CBPL in February 2020, the Authority identified significant weaknesses and gaps in the Firm's financial crime control framework. The Authority considered that the weaknesses meant that CBPL's business should be restricted to prevent high-risk customers accessing its e-money and payment services while the Firm remediated its financial crime controls.

64. The Final Notice also provided detail about how the FCA conducted its investigation

into CBPL's conduct:

The Firm was the subject of a financial crime controls assessment visit on 27 and 28 February 2020. Following the visit, on 30 April 2020, the Authority issued a feedback letter, which concluded that significant weaknesses and gaps persisted in CBPL's financial crime control framework. The Authority noted that this was particularly concerning given the high-risk nature of CBPL's business and that limited progress appeared to have been made to address issues highlighted in audits performed by the Firm since 2018. In particular, a sample of reviewed files showed limited evidence of risk assessments having been performed in certain high risk situations.

65. The Final Notice stated that after the FCA's February 2020 findings, the FCA and

CBPL worked together to agree on what a "high-risk" customer is, with the goal of preventing high-

risk customers from using the Company's platform. Specifically, the Final Notice stated:

In the following months [after the February 2020 findings of "significant weaknesses and gaps" in CBPL's financial crime control framework], the Authority engaged with CBPL to agree [on] a definition of "high-risk" which would enable CBPL's automated onboarding systems to prevent such customers being onboarded. On 30 October 2020, on CBPL's application, the Authority imposed on CBPL requirements which prevented such customers from being onboarded or provided with payment or e-money services ("the CBPL VREQ"). These were mandatory regulatory requirements, with which CBPL was required to comply.

66.    The Final Notice also described that, under the terms of the VREQ:

"the Firm was required not to onboard, provide payment services or issue e-money to: a) new institutional or corporate customers identified as 'high-risk' or 'ineligible' as per the Firm's institutional customer risk rating methodology; and b) new retail or personal customers that met any one of a number of specific criteria."

67.    The Final Notice further stated that despite the prohibitions in the VREQ:

Between 31 October 2020 and 1 October 2023 (the "Relevant Period") CBPL onboarded approximately 3.9 million customers. During this time CBPL repeatedly breached the requirements imposed on it by the CBPL VREQ by: a) onboarding and/or providing payment or e-money services to 13,416 separate high-risk customers, as defined by the CBPL VREQ, with some of these customers being provided payment or e-money services on multiple occasions; and b) permitting approximately 31% of these customers to make 12,912 prohibited deposits with a total value of approximately USD $24.9 million; these monies were then used to make withdrawals and, thereafter, execute multiple cryptoasset transactions via other Coinbase Group entities using the same funds, totaling approximately USD $226 million.

68.    The Final Notice also provided detail regarding the causes of the CBPL's breaches of

the VREQ:

The breaches of the CBPL VREQ were caused by a failure on the part of CBPL, between 30 October 2020 and 14 April 2023, in breach of Principle 2 of the Authority's Principles for Businesses (the "Principles"), to exercise due skill, care and diligence in relation to the design, testing, implementation and monitoring of the controls put in place to ensure compliance with it, including an automated 'flag' placed on relevant customers' accounts ("the VREQ Flag"). In particular:

(a) CBPL failed to maintain adequate records regarding the steps it took to ensure compliance with the CBPL VREQ;

(b) CBPL failed to ensure that the engineers tasked with updating the automated onboarding process were provided with complete instructions, including the most recent version of the CBPL VREQ, meaning that, when originally implemented, the controls failed to give full effect to the CBPL VREQ;

(c) CBPL's pre-implementation testing of the VREQ Flag was inadequate;

(d) CBPL failed to adequately consider all of the various products and systems through which customers could access e-money services when designing and implementing the VREQ Flag;

(e) CBPL failed to ensure that when certain new systems enabling customers to execute transactions were introduced, effective controls were introduced to ensure that the new systems did not undermine CBPL's compliance with the terms of the CBPL VREQ;

(f) CBPL failed to adequately consider all of the various ways in which customers might be onboarded when designing and implementing the VREQ Flag, in particular the position of customers migrating from other Coinbase Group entities and, crucially, whether an assessment was conducted at that time to ensure that any high-risk customers seeking to onboard were subject to the VREQ Flag;

(g) The initial monitoring of compliance with the CBPL VREQ, conducted by the Product, Engineering and Design team ("PED") within the Coinbase Group, was inadequate; this meant that repeated and material breaches of the CBPL VREQ went undiscovered for almost 2 years; and

(h) Notwithstanding CBPL identifying breaches of the VREQ shortly after it came into effect, CBPL failed to conduct a formal review of the overall effectiveness of the controls intended to ensure compliance with the CBPL VREQ until 2 years after it came into force, nor did the Firm issue a formal documented framework for ensuring compliance with the CBPL VREQ until April 2023.

69.    In the Final Notice, the FCA described the CBPL's failings in relation to the controls that it put in place through the VREQ as "serious and persistent."  Further, the Final Notice stated that "[t]he failings significantly increased the risk that financial crime might be facilitated by the Firm at a time when the Authority had informed CBPL that its systems and controls were not fully effective and required remediation."

70.    Based on the findings from both the New York Department of Financial Services' and the Financial Conduct Authority's investigations into Coinbase and the CBPL's compliance practices, it is evident that Defendants were aware of the deficiencies in the Company's compliance functions, but concealed these deficiencies from investors.

- 26 -

VI.    **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

A.    **April 14, 2021 Registration Statement**

71.    The Class Period begins on April 14, 2021.  On that date, the Company filed with the SEC a prospectus pursuant to Rule 424(b)(4), which was incorporated into and formed a part of the February 25, 2021 Registration Statement, as amended on March 17, 2021 and March 23, 2021 (the "April 14 Registration Statement"), and held its Initial Public Offering ("IPO").

72.    The April 14 Registration Statement stated that:

> *We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition.*
>
> *Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate*, including those governing financial services and banking, trust companies, securities, broker-dealers and ATS, commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies.  As a result, they do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another. Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions. To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

- 27 -

73. The April 14 Registration Statement asserted that Coinbase had built "***robust know-your-customer and anti-money laundering programs***."

74. The April 14 Registration Statement discussed at length the Company's compliance with AML and KYC regulations in multiple jurisdictions:

Anti-money laundering and counter-terrorist financing

***We are subject to various anti-money laundering and counter-terrorist financing laws, including the BSA in the United States, and similar laws and regulations abroad***. In the United States, as a money services business registered with FinCEN, the BSA requires us to among other things, develop, implement, and maintain a risk-based anti-money laundering program, provide an anti-money laundering-related training program, report suspicious activities and transactions to FinCEN, comply with certain reporting and recordkeeping requirements, and collect and maintain information about our customers. In addition, the BSA requires us to comply with certain customer due diligence requirements as part of our anti-money laundering obligations, including developing risk-based policies, procedures, and internal controls reasonably designed to verify a customer's identity. Many states and ***other countries impose similar and, in some cases, more stringent requirements related to anti-money laundering and counter-terrorist financing. We have implemented a compliance program designed to prevent our platform from being used to facilitate money laundering, terrorist financing, and other illicit activity in countries, or with persons or entities, included on designated lists promulgated by OFAC and equivalent foreign authorities***. Our compliance program includes policies, procedures, reporting protocols, and internal controls, and is ***designed to address legal and regulatory requirements*** as well as to assist us in ***managing risks associated with money laundering and terrorist financing***. Anti-money laundering regulations are constantly evolving and vary from jurisdiction-to-jurisdiction. We continuously monitor our compliance with anti-money laundering and counter-terrorist financing regulations and industry standards and implement policies, procedures, and controls in light of the most current legal requirements.

75. The April 14 Registration Statement contained the following risk disclosure:

Our platform ***may be exploited*** to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. If any of our customers use our platform to further such illegal activities, our business could be adversely affected.

76. Finally, in the April 14 Registration Statement, Coinbase made the following claim regarding current regulatory proceedings that the Company was facing:

We are and, from time to time, ***we may become, subject to various legal proceedings and regulatory investigation matters*** that arise in the ordinary course of our

- 28 -

business. We are also subject to regulatory oversight by numerous state, federal, and foreign regulators. For example, in December 2019, the Attorney General for the State of California issued an investigative subpoena for documents covering our business practices and policies, customer complaints, asset launches, and certain of our ongoing litigation. Similarly, in September 2020, the Attorney General for the State of Massachusetts issued an investigative subpoena for documents covering our business practices and policies, customer complaints, certain transfers of crypto assets, and certain of our ongoing litigation. In addition, in December 2020, the SEC issued an investigative subpoena for documents and information about certain of our customer programs and operations. And in January 2021, the California Department of Fair Employment and Housing issued an investigative subpoena for documents and information related to certain of our business practices and policies. We intend to cooperate fully with such investigations. ***We are not presently a party to any other legal or regulatory proceedings that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows***.

**B.     May 13, 2021 Quarterly Report on Form 10-Q**

77.     The Company filed its Quarterly Report for the period ended March 31, 2021 with the

SEC on May 13, 2021 (the "Q1'21 10-Q").

78.     The Q1'21 10-Q stated that:

> ***We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition***.
>
> ***Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate***, including those governing financial services and banking, trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counterterrorist financing. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies. As a result, they do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified,

- 29 -

interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another. Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions. To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

79.    In the Q1'21 10-Q, the Company made the following statement:

As we expand and localize our international activities, we have become increasingly ***obligated to comply with the laws, rules, regulations, policies, and legal interpretations both of the jurisdictions in which we operate and those into which we offer services on a cross-border basis***. Laws regulating financial services, the internet, mobile technologies, crypto, and related technologies outside of the United States often impose different, more specific, or even conflicting obligations on us, as well as broader liability. For example, we are required to comply with laws and regulations related to sanctions and export controls enforced by U.S. Department of Treasury's Office of Foreign Assets Control, or OFAC, and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators.

80.    The Q1'21 10-Q contained the following risk disclosure:

Our platform ***may be exploited*** to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. ***If*** any of ***our customers*** use our platform to further such illegal activities, our business could be adversely affected.

81.    In the Q1'21 10-Q, Coinbase made the following claim regarding current regulatory proceedings that the Company was facing:

We are and, from time to time, we may become, subject to various legal proceedings and regulatory investigation matters that arise in the ordinary course of our business. We are also subject to regulatory oversight by numerous state, federal, ***and foreign regulators***. For example, in December 2019, the Attorney General for the State of California issued an investigative subpoena for documents covering our business practices and policies, customer complaints, asset launches, and certain of our ongoing litigation. Similarly, in September 2020, the Attorney General for the State of Massachusetts issued an investigative subpoena for documents covering our business practices and policies, customer complaints, certain transfers of crypto assets, and certain of our ongoing litigation. In addition, in December 2020, the SEC issued an investigative subpoena for documents and information about certain of our customer programs and operations. And in January 2021, the California Department

- 30 -

of Fair Employment and Housing issued an investigative subpoena for documents and information related to certain of our business practices and policies. We intend to cooperate fully with such investigations. ***We are not presently a party to any other legal or regulatory proceedings that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows***.

### C.    June 25, 2021 Public Statement

82.    On June 25, 2021, Surojit Chatterjee, Coinbase's CPO spoke during a #ProductCon

YouTube presentation entitled: "Building for Economic Freedom." During that presentation,

Chatterjee stated: "we invest an enormous amount of resources in trying to maximize the safety of

our products. That means ***ensuring*** that our systems are resilient to attack, and ***that we do proper***

***KYC for every user on our platform and comply fully with anti-money laundering laws***."

### D.    August 11, 2021 Quarterly Report on Form 10-Q

83.    The Company filed its Quarterly Report for the period ended June 30, 2021 with the

SEC on August 11, 2021 (the "Q2'21 10-Q").

84.    The Q2'21 10-Q stated that:

> ***We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition***.
>
> ***Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate***, including those governing financial services and banking, trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies. As a result, they do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and

4904-0075-6784.v1

international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another.  Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions.  To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

85.     The Q2'21 10-Q contained the following risk disclosure:

Our platform ***may be exploited to facilitate illegal activity*** such as fraud, money laundering, gambling, tax evasion, and scams.  If any of our customers use our platform to further such illegal activities, our business could be adversely affected.

86.     In the Q2'21 10-Q, the Company made the following statement:

As we expand and localize our international activities, we have become increasingly . . . laws regulating financial services, the internet, mobile technologies, crypto, . . . ***obligated to comply with the laws, rules, regulations, policies, and legal interpretations both of the jurisdictions in which we operate and those into which we offer services on a cross-border basis***. . . . [A]nd related technologies outside of the United States are highly evolving, extensive and often impose different, more specific, or even conflicting obligations on us, as well as broader liability.  For example, we are required to comply with laws and regulations related to sanctions and export controls enforced by U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"), and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators.

87.     In the Q2'21 10-Q, Coinbase made the following claim regarding current regulatory

proceedings that the Company was facing:

We are also subject to regulatory oversight by numerous state, federal, ***and foreign regulators*** and we are and we may become subject to various legal proceedings, investigations, and demand letters that arise in the course of our business.  For example, we have received investigative subpoenas and other inquiries from various state attorneys general for documents and information pertaining to our business practices and policies, customer complaints, asset launches, certain ongoing litigation, and certain transfers of crypto assets.  In addition, we have received investigative subpoenas from the SEC and similar subpoenas and demand letters from various state regulators for documents and information about certain of our

- 32 -

customer programs, operations, and intended future products, including our stablecoin and yield-generating products.  And in January 2021, the California Department of Fair Employment and Housing issued an investigative subpoena for documents and information related to certain of our business practices and policies. We intend to cooperate fully with such investigations.  *We are not presently a party to any other legal or regulatory proceedings that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows*.

## E.    November 10, 2021 Quarterly Report on Form 10-Q

88.    The Company filed its Quarterly Report for the period ended September 30, 2021

with the SEC on November 10, 2021 (the "Q3'21 10-Q").

89.    The Q3'21 10-Q stated that:

*We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition*.

*Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate*, including those governing financial services and banking, trust companies, securities, broker-dealers and alternative trading systems ("ATS") commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counterterrorist financing.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies.  As a result, they do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another.  Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions.  To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm,

and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

90.     The Q3'21 10-Q contained the following risk disclosure:

Our platform *may be exploited to facilitate illegal activity* such as fraud, money laundering, gambling, tax evasion, and scams. *If any of our customers use* our platform to further such illegal activities, our business could be adversely affected.

91.     In the Q3'21 10-Q, the Company made the following statement:

As we expand and localize our international activities, we have become increasingly *obligated to comply with the laws, rules, regulations, policies, and legal interpretations of both the jurisdictions in which we operate and those into which we offer services on a cross-border basis*. . . . Laws regulating financial services, the internet, mobile technologies, crypto, and related technologies outside of the United States are highly evolving, extensive and often impose different, more specific, or even conflicting obligations on us, as well as broader liability. In addition, we are required to comply with laws and regulations related to economic sanctions and export controls enforced by U.S. Department of Commerce's Bureau of Industry and Security, and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators.

92.     In the Q3'21 10-Q, Coinbase made the following claim regarding current regulatory

proceedings that the Company was facing:

We are also subject to regulatory oversight by numerous state, federal, and *foreign regulators* and we are and we *may become subject* to various legal proceedings, inquiries, investigations, and demand letters that arise in the course of our business. For example, we have received investigative subpoenas and other inquiries from various state attorneys general for documents and information pertaining to our business practices and policies, customer complaints, asset launches, certain ongoing litigation, and certain transfers of crypto assets. In addition, we have received investigative subpoenas from the SEC and similar subpoenas and demand letters from various state regulators for documents and information about certain of our customer programs, operations, and intended future products, including our stablecoin and yield-generating products. For example, in January 2021, the California Department of Fair Employment and Housing issued an investigative subpoena for documents and information related to certain of our business practices and policies, and the matter is ongoing. We intend to cooperate fully with such investigations. These examples are not exhaustive. We are not presently a party to any other legal or regulatory proceedings that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows.

F.     **December 8, 2021 Testimony Before the U.S. House Committee on Financial Services**

93.     On December 8, 2021, Alesia Haas, Coinbase's CFO appeared before the U.S. House Committee on Financial Services to give testimony regarding "digital assets and the future of finance." During her testimony, Haas misrepresented Coinbase's compliance with KYC and AML laws, stating in pertinent part that "Coinbase implements a ***robust Anti-Money Laundering (AML) program, requires Know Your Customer (KYC) information when onboarding customers***, ***reviews transactions for suspicious activity, files suspicious activity reports (SARs), and regularly engages with law enforcement***."

94.     The statements detailed in ¶¶71-93 above were materially false and misleading when made and omitted material information. The true facts, which were then known to or recklessly disregarded by Defendants, include:

(a)     Beginning in May 2020, the NYDFS was investigating Coinbase's compliance with AML and KYC regulations.

(b)     The findings of the Department's investigation, which were communicated to the Company's senior management in September 2020, included the following findings:

(i)     There were "significant deficiencies across Coinbase's compliance program, including its Know-Your-Customer/Customer Due Diligence ("KYC/CDD") procedures, [and] its Transaction Monitory System ("TMS") . . . ."

(ii)     "Coinbase failed to conduct adequate Anti-Money Laundering ("AML") risk assessments since 2017."

(iii)     Coinbase "KYC/CDD program" was "immature and inadequate."

(iv)     "Coinbase treated customer onboarding requirements as a simple check-the-box exercise" and the Company's KYC due diligence file "historically consisted of little more than a copy of a photo ID."

- 35 -

(v)     Coinbase regularly failed to report suspicious activity to the Federal Government within 30 days of detection, as it was required to do by Federal regulations.

(vi)     Even after the investigation concluded, "substantial weaknesses remained" in the Company's compliance with the Department's KYC and AML regulations throughout 2021.

(vii)     By the end of 2021, Coinbase had a backlog of more than 14,000 customers requiring EDD screening on high-risk customers, and more than 100,000 TMS alerts, which notify the Company of potentially suspicious activity occurring on its platform.  Due to a growing number of customer sign-ups, Coinbase "lacked sufficient personnel, resources, and tools needed to keep up with these alerts."

(viii)     The Company's oversight and training of the third-party contractors that it hired to review TMS alerts was "insufficient" and the contractors' work was "rife with errors."

(ix)     The Company's violation of the Department's AML and KYC regulations were so severe that, in 2021, the Department began an "enforcement investigation" into whether the Company's behavior amounted to "legal violations."

(x)     The Department found that Coinbase did not "structure[] its compliance program to fully account for" instances in which its customers may attempt to mask their geographic location for nefarious or illegal purposes.

(c)     Defendants also concealed from investors that CBPL was being investigated by the FCA.

(d)     Defendants concealed from investors that CBPL entered into a VREQ with the FCA to ensure improvement in its compliance functions, yet repeatedly violated the terms of the VREQ.

(e)     Defendants concealed from investors that the FCA's investigation, like the Department's investigation, exposed significant deficiencies in the Company's AML and KYC compliance, including:

(i)     "[S]ignificant weaknesses and gaps in the [Company's] financial crime control framework."

(ii)    Between October 31, 2020 and December 18, 2020, CBPL onboarded "4,471 high risk customers" due to gaps in CBPL's KYC controls, nearly 2,800 of which undertook transactions prohibited under the terms of the VREQ.

95.     Furthermore, the statements referenced in ¶¶73-74 above were materially false and misleading when made because, contrary to Defendants' statements describing Coinbase's "robust know-your-customer and anti-money laundering programs," and that Coinbase's "compliance program" was "designed to address legal and regulatory requirements" which assists it in "managing risks associated with money laundering and terrorist financing," Defendants knew, or recklessly disregarded, that Coinbase violated KYC and AML laws and regulations and was being investigated by the New York Department of Financial Services and the FCA for violations.

96.     Additionally, contrary to Defendants' statements referenced in ¶¶75-76, 81, and 87 above that Coinbase "may be exploited to facilitate illegal activity," "[i]f any of our customers use our platform to further such illegal activities, our business could be adversely affected," that Coinbase was "not presently a party to any other legal or regulatory proceedings," and it "may become, subject to various legal proceedings and regulatory investigation matters," Defendants knew, or recklessly disregarded, that Coinbase was being exploited to facilitate illegal activity, its customers used Coinbase's platform to further illegal activities, and Coinbase was subject to various undisclosed regulatory investigation matters, including by the NYDFS and the FCA.

G.    **February 25, 2022 Annual Report on Form 10-K**

97.    The Company filed its Annual Report for the Fiscal Year 2021 with the SEC on February 25, 2022 (the "FY'21 10-K").

98.    The FY'21 10-K stated that:

*We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition.*

*Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate*, including those governing financial services and banking, federal government contractors, trust companies, securities, broker-dealers and alterative trading systems, or ATS, commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another.  Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions.  To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

99.    In the FY'21 10-K, the Company made the following statement:

As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and *we may be subject to inquiries, investigations, and enforcement actions by* U.S. and *non-U.S. regulators and governmental*

*authorities*, including those related to sanctions, export control, and ***anti-money laundering***.

In addition, we are required to comply with laws and regulations related to economic sanctions and export controls enforced by U.S. Department of Commerce's Bureau of Industry and Security, and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators.

100.    In the FY'21 10-K, Coinbase revealed that it was being investigated by the NYDFS for violation of the Bank Secrecy Act and other rules and regulations, stating in pertinent part, as follows:

> Our subsidiary, Coinbase, Inc., which holds a Bitlicense from the NYDFS and is therefore subject to examinations and investigations by the NYDFS, is currently subject to an investigation by the NYDFS relating to its compliance program including compliance with the Bank Secrecy Act and sanctions laws, cybersecurity, and customer support. Coinbase, Inc. is cooperating fully and has undertaken initial remedial measures, and may face additional remedial and other measures. See the section titled "*Risk Factors*" in Part I, Item 1A of this Annual Report on Form 10-K, including the discussion of legal and regulatory requirements applicable to our business and potential consequences relating to our failure to comply with such legal and regulatory requirements. Based on the ongoing nature of the investigation, the outcome of this matter remains uncertain.

101.    In the FY'21 10-K, Coinbase made the following claim regarding current regulatory proceedings that the Company was facing:

> We are also subject to regulatory oversight by numerous state, federal, and ***foreign regulators*** and we are and we ***may become subject*** to various legal proceedings, inquiries, investigations, and demand letters that arise in the course of our business. For example, we have received investigative subpoenas and other inquiries from various state attorneys general for documents and information pertaining to our business practices and policies, customer complaints, asset launches, certain ongoing litigation, and certain transfers of crypto assets. In addition, we have received investigative subpoenas from the SEC and similar subpoenas and demand letters from various state regulators for documents and information about certain of our customer programs, operations, and intended future products, including our stablecoin and yield-generating products. For example, in January 2021, the California Department of Fair Employment and Housing issued an investigative subpoena for documents and information related to certain of our business practices and policies, and the matter is ongoing. We intend to cooperate fully with such investigations. These examples are not exhaustive. ***We are not presently a party to any other legal or regulatory proceedings that in the opinion of our management, if determined adversely to us, would individually or taken***

*together have a material adverse effect on our business, operating results, financial condition, or cash flows*.

102.    The FY'21 10-K asserted that Coinbase had built "robust know-your-customer and anti-money laundering programs."

103.    The FY'21 10-K also discussed at length the Company's compliance with AML and KYC provisions in multiple jurisdictions:

Anti-money laundering and counter-terrorist financing

*We are subject to various anti-money laundering and counter-terrorist financing laws, including the BSA in the United States, and similar laws and regulations abroad*.  In the United States, as a money services business registered with the Financial Crimes Enforcement Network, or FinCEN, the BSA requires us to among other things, develop, implement, and maintain a risk-based anti-money laundering program, provide an anti-money laundering-related training program, report suspicious activities and transactions to FinCEN, comply with certain reporting and recordkeeping requirements, and collect and maintain information about our customers.  In addition, the BSA requires us to comply with certain customer due diligence requirements as part of our anti-money laundering obligations, including developing risk-based policies, procedures, and internal controls reasonably designed to verify a customer's identity.  Many states and *other countries impose similar and, in some cases, more stringent requirements related to anti-money laundering and counter-terrorist financing.  We have implemented a compliance program designed to prevent our platform from being used to facilitate money laundering, terrorist financing, and other illicit activity in countries, or with persons or entities, included on designated lists promulgated by the Office of Foreign Assets Control, or OFAC, and equivalent foreign authorities*.  Our compliance program includes policies, procedures, reporting protocols, and internal controls, and is *designed to address legal and regulatory requirements* as well as to assist us in managing risks associated with money laundering and terrorist financing. Anti-money laundering regulations are constantly evolving and vary from jurisdiction-to-jurisdiction.  We continuously monitor our compliance with anti-money laundering and counter-terrorist financing regulations and industry standards and implement policies, procedures, and controls in light of the most current legal requirements.

104.    The FY'21 10-K contained the following risk disclosure:

Our platform *may be exploited* to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams.  *If* any of *our customers use* our platform to further such illegal activities, our business could be adversely affected.

H.    **March 9, 2022 Morgan Stanley Technology, Media, and Telecom Conference**

105.    On March 9, 2022, Haas attended the Morgan Stanley Technology, Media, and Telecom Conference.  During the Q&A portion of the conference, Haas told investors: "*[w]e protect against illicit market activity and manipulation*."

I.    **May 10, 2022 Quarterly Report Filed on Form 10-Q**

106.    The Company filed its Quarterly Report for the period ended March 31, 2022 with the SEC on May 10, 2022 (the "Q1'22 Form 10-Q").

107.    The Q1'22 10-Q stated that:

> *We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition*.
>
> *Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate*, including those governing financial services and banking, federal government contractors, trust companies, securities, broker-dealers and alternative trading systems ("ATS")commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another.  Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions.  To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory

- 41 -

consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

108.    In the Q1'22 10-Q, the Company made the following statement:

As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and *we may be subject to inquiries, investigations, and enforcement actions by* U.S. and *non-U.S. regulators and governmental authorities*, including those related to sanctions, export control, and *anti-money laundering*.

In addition, we are required to comply with laws and regulations related to economic sanctions and export controls enforced by U.S. Department of Commerce's Bureau of Industry and Security, and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators.

109.    The Q1'22 10-Q contained the following risk disclosure:

Our platform *may be exploited* to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams.  *If* any of *our customers use* our platform to further such illegal activities, our business could be adversely affected.

110.    In the Q1'22 10-Q, Coinbase again mentioned the NYDFS investigation over violations of the Bank Secrecy Act and other rules and regulations, stating in pertinent part, as follows:

The Company's subsidiary, Coinbase, Inc., which holds a Bitlicense from the New York Department of Financial Services ("NYDFS") and is therefore subject to examinations and investigations by the NYDFS, is currently subject to an investigation by the NYDFS relating to its compliance program including compliance with the Bank Secrecy Act and sanctions laws, cybersecurity, and customer support.  Coinbase, Inc. is cooperating fully and has undertaken initial remedial measures, and may face additional remedial and other measures.  Based on the ongoing nature of the investigation, the outcome of this matter remains uncertain and the Company cannot estimate the potential impact, if any, on its business or financial statements at this time.

*        *        *

*We are not presently a party to any other legal or regulatory proceedings that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows*.

- 42 -

**J.    August 9, 2022 Quarterly Report Filed on Form 10-Q**

111.    The Company filed its Quarterly Report for the period ended June 30, 2022 with the

SEC on August 9, 2022 (the "Q2'22 10-Q").

112.    The Q2'22 10-Q stated that:

> *We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition*.
>
> *Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate*, including those governing financial services and banking, federal government contractors, trust companies, securities, derivative transactions and markets, broker-dealers and alternative trading systems ("ATS"), commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counterterrorist financing.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another.  Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions.  To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

113.    In the Q2'22 10-Q, the Company made the following statement:

> As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and *we may be subject to inquiries, investigations, and enforcement actions by* U.S. and *non-U.S. regulators and governmental*

*authorities*, including those related to sanctions, export control, and *anti-money laundering*.

In addition, we are required to comply with laws and regulations related to economic sanctions and export controls enforced by U.S. Department of Commerce's Bureau of Industry and Security, and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators.

114.    The Q2'22 10-Q contained the following risk disclosure:

Our *platform may be exploited* to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. *If* any of *our customers use* our platform to further such illegal activities, our business could be adversely affected.

115.    In the Q2'22 10-Q, Coinbase made the following claim regarding current regulatory

proceedings that the Company was facing:

The Company's subsidiary, Coinbase, Inc., which holds a BitLicense from the New York Department of Financial Services ("NYDFS") and is therefore subject to examinations and investigations by the NYDFS, is currently subject to an investigation by the NYDFS relating to its compliance program including compliance with the Bank Secrecy Act and sanctions laws, cybersecurity, and customer support. Coinbase, Inc. is cooperating fully and has undertaken initial remedial measures, and may face additional remedial and other measures. Based on the ongoing nature of the investigation, the outcome of this matter remains uncertain and the Company cannot estimate the potential impact, if any, on its business or financial statements at this time.

*        *        *

*We are not presently a party to any other legal or regulatory proceedings that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows*.

**K.    November 1, 2022 Letter to the United States Department of the Treasury**

116.    On November 1, 2022, Paul Grewal, the Company's CLO, sent a letter to the U.S.

Department of the Treasury on behalf of Coinbase falsely representing that Coinbase had developed

effective compliance programs, stating in pertinent part, as follows:

To meet their BSA obligations, VASPs like Coinbase have devoted enormous resources to developing *effective compliance programs*. This includes traditional

controls like ***collecting KYC information***, ***monitoring on-platform transactions, and filing SARs***, but more critically, deploying innovative technologies that leverage the public and transparent nature of the blockchain, which is not constrained by private ledgers.

**L.      November 3, 2022 Quarterly Report Filed on Form 10-Q**

117.    The Company filed its Quarterly Report for the period ended September 30, 2022

with the SEC on November 3, 2022 (the "Q3'22 10-Q").

118.    The Q3'22 10-Q stated that:

> *We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition.*
>
> *Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate*, including those governing financial services and banking, federal government contractors, trust companies, securities, derivative transactions and markets, broker-dealers and alternative trading systems ("ATS"), commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another.  Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions.  To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

119.    In the Q3'22 10-Q, the Company made the following statement:

- 45 -

As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and ***we may be subject*** to inquiries, investigations, and ***enforcement actions by*** U.S. and ***non-U.S. regulators and governmental authorities***, including those related to sanctions, export control, and ***anti-money laundering***.

***In addition, we are required to comply with laws and regulations related to economic sanctions and export controls enforced by U.S. Department of Commerce's Bureau of Industry and Security, and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators***.

120.    The Q3'22 10-Q contained the following risk disclosure:

"Our platform ***may be exploited*** to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. ***If*** any of ***our customers use*** our platform to further such illegal activities, our business could be adversely affected."

121.    In the Q3'22 10-Q, Coinbase made the following claim regarding current regulatory proceedings that the Company was facing:

The Company's subsidiary, Coinbase, Inc., which holds a BitLicense from the New York Department of Financial Services ("NYDFS") and is therefore subject to examinations and investigations by the NYDFS, is currently subject to an investigation by the NYDFS relating to its compliance program including compliance with the Bank Secrecy Act and sanctions laws, cybersecurity, and customer support. The Company is cooperating fully and has undertaken initial remedial measures. Resolution of this matter, including as a result of any mutually agreed upon settlement, may result in fines and additional remedial measures. At this time, the outcome of this matter remains uncertain and the Company cannot estimate the reasonably possible range of outcomes on its business or financial statements.

\*      \*      \*

***We are not presently a party to any other legal or regulatory proceedings that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows***.

122.    The statements detailed in ¶¶97-121 above were materially false and misleading when made and omitted material information. The true facts, which were then known to or recklessly disregarded by Defendants, include:

- 46 -

(a)    While Defendants disclosed that Coinbase was being investigated by NYDFS, they concealed from investors and the market the Department's findings, which Defendants knew at the time the statements were made, including that:

(i)    "Coinbase failed to conduct adequate Anti-Money Laundering ("AML") risk assessments since 2017."

(ii)    Coinbase "KYC/CDD program" was "immature and inadequate."

(iii)    "Coinbase treated customer onboarding as a simple check-the-box exercise" and the Company's KYC due diligence file "historically consisted of little more than a copy of a photo ID."

(iv)    Coinbase regularly failed to report suspicious activity to the Federal Government within 30 days of detection, as it was required to do by Federal regulations.

(v)    "[S]ubstantial weakness[] remained" in the Company's compliance with the Department's KYC and AML regulations throughout 2021.

(vi)    At the end of 2021, Coinbase had a backlog of more than 14,000 customers requiring EDD screening on high-risk customers, and more than 100,000 TMS alerts, which notify the Company of potentially suspicious activity occurring on its platform.  Due to a growing number of customer sign-ups, Coinbase "lacked sufficient personnel, resources, and tools needed to keep up with these alerts."

(vii)    The Company's oversight and training of the third-party contractors that it hired to review TMS alerts, was "insufficient" and the contractors' work was "rife with errors."

(viii)    The Company's violation of the Department's AML and KYC regulations were so severe that, in 2021, the Department began an "enforcement investigation" into whether the Company's behavior amounted to "legal violations."

- 47 -

(ix)    On February 10, 2022, the Department ordered the Company to retain an independent monitor in order to assist Coinbase in complying with AML and KYC regulations.

(x)    The Department found that Coinbase did not "structure[] its compliance program to fully account for" instances in which its customers may attempt to mask their geographic location for nefarious or illegal purposes.

(xi)    It was apparent, by March 2022, that there were "serious quality issues" with work being performed by the outside contractors that Coinbase hired to work on the backlog of TMS alerts, and that more than half of the alerts cleared by these contractors failed a quality assurance review.  In total, 73,000 "problematic" TMS alerts were inappropriately cleared.

(xii)    As of July 11, 2022, there was a backlog of over 10,000 high risk customers requiring EDD.

(b)    Despite disclosing the existence of the NYDFS investigation, Defendants continued to conceal from investors that CBPL was also being investigated by the FCA.

(c)    Defendants concealed from investors that CBPL entered into a VREQ with the FCA to ensure improvement in its compliance functions, yet repeatedly violated the terms of the VREQ.

(d)    Defendants concealed from investors that the FCA's investigation, like the Department's investigation, exposed significant deficiencies in the Company's AML and KYC compliance, including:

(i)    "significant weaknesses and gaps in the [Company's] financial crime control framework."

(ii)    Between October 31, 2020 and December 18, 2020, CBPL onboarded "4,471 high-risk customers" due to gaps in CBPL's KYC controls, nearly 2,800 of which undertook transactions prohibited under the terms of the VREQ.

- 48 -

(iii)     On October 21, 2022, CBPL determined that a further 8,183 customers had been able to access e-money services in violation of the VREQ, due to "ineffective application" of CBPL's compliance plan under the VREQ.  An additional 1,034 high risk customers were allowed to "migrate[]" to CBPL's platform from other Coinbase Group entities, and to access e-money services because no assessment was conducted as to whether their account should be flagged.

(iv)     Between October 31, 2020 and October 28, 2022, a total of 9,416 high risk customers were onboarded and granted access to e-money services in violation of the VREQ. Of these, 1,155 made deposits, totaling $17.86 million.

123.     Furthermore, the statements referenced in ¶¶102-103 above were materially false and misleading when made because, contrary to Defendants statements describing Coinbase's "robust know-your-customer and anti-money laundering programs," and that Coinbase's "Compliance program" was "designed to address legal and regulatory requirements" which assists it in "managing risks associated with money laundering and terrorist financing," Defendants knew, or recklessly disregarded, that Coinbase violated KYC and AML laws and regulations in New York and the United Kingdom and was being investigated by the FCA for violations.

124.     Additionally, contrary to Defendants' statements referenced in ¶¶101, 104, 109-110, 114-115, and 120-121 above that Coinbase "may be exploited to facilitate illegal activity," "[i]f any of our customers use our platform to further such illegal activities, our business could be adversely affected," that Coinbase was "not presently a party to any other legal or regulatory proceedings," and it "may be subject to inquiries, investigations and enforcements actions," Defendants knew, or recklessly disregarded, that Coinbase was being exploited to facilitate illegal activity, its customers used Coinbase's platform to further illegal activities, and Coinbase was being investigated by the FCA.

**M.     January 4, 2023 Statement Regarding the Company's Settlement with the New York State Department of Financial Services**

125.    On January 4, 2023, following the news that Coinbase had entered into a $100 million settlement with the Department, the Company and Grewal released a statement regarding Coinbase's continuing commitment to compliance with AML and KYC laws and regulations:

> We are grateful for our partnership with the NYDFS since we received our BitLicense in 2017 and are proud of our collaboration with regulators more broadly. In particular, we are proud that law enforcement looks to Coinbase for expertise in fighting crypto-related financial crime. ***We routinely conduct proactive investigations to remove bad actors from our platform and work with law enforcement to ensure they are brought to justice***.
>
> *                  *                  *
>
> ***Coinbase remains committed to being a leader and role model in the crypto space, and this means partnering with regulators when it comes to compliance and other areas***. We believe our investment in compliance outpaces every other crypto exchange anywhere in the world, and that our customers should feel safe and protected while using our platforms. And although we have not always been perfect, our goal has always been and will always be to build the most trusted, compliant, and secure crypto exchange in the world. Our customers deserve nothing less.

**N.     February 21, 2023 Earnings Call and Annual Report on Form 10-K**

126.    The Company filed its Annual Report for the Fiscal Year 2022 with the SEC on February 21, 2023 (the "FY'22 10-K").

127.    The FY'22 10-K stated that:

> ***We are subject to an extensive, highly-evolving, and uncertain regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition***.
>
> ***Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate***, including those governing financial services and banking, federal government contractors, trust companies, securities, derivative transactions and markets, broker-dealers and alternative trading systems ("ATS"), commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment

processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counterterrorist financing. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another. Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions. To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

128.    In the FY'22 10-K, the Company stated:

Moreover, we invest heavily in compliance tools. For example, in addition to **robust know-your-customer and anti-money laundering programs**, we employ an industry leading third-party trade surveillance software platform that helps us **monitor and detect problematic trading activities on our platform**. We have also invested in a range of technologies that are designed to help identify and prevent harmful activity on our platform, including fraud or account takeovers.

\*    \*    \*

**We serve our customers through Electronic Money Institutions authorized by the U.K. Financial Conduct Authority and the Central Bank of Ireland. We comply with rules and regulations applicable to the European e-money industry, including those related to . . . anti-money laundering . . . .**

\*    \*    \*

As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and **we may be subject to inquiries, investigations, and enforcement actions by U.S. and non-U.S. regulators and governmental authorities, including those related to . . . anti-money laundering . . . .**

\*    \*    \*

Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and

- 51 -

guidance in the markets in which we operate, including . . . anti-money laundering, and counter-terrorist financing. . . .

**To the extent we have not complied** with such laws, rules, and regulations, **we could be** subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

\*        \*        \*

As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and we **may be subject to inquiries**, investigations, and enforcement actions by U.S. and **non-U.S. regulators and governmental authorities, including those related to sanctions, export control, and anti-money laundering**.

As we expand and localize our international activities, we have become increasingly obligated to comply with the laws, rules, regulations, policies, and legal interpretations of both the jurisdictions in which we operate and those into which we offer services on a cross-border basis. For instance, **financial regulators outside the United States have increased their scrutiny of crypto asset exchanges** over time, such as by requiring crypto asset exchanges operating in their local jurisdictions to be regulated and licensed under local laws. Moreover, laws regulating financial services, the internet, mobile technologies, crypto, and related technologies outside of the United States are highly evolving, extensive and often impose different, more specific, or even conflicting obligations on us, as well as broader liability. In addition, **we are required to comply with** . . . and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators.

\*        \*        \*

Our platform **may be** exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. **If** any of **our customers use** our platform to further such illegal activities, our business **could be** adversely affected.

Our platform may be exploited to facilitate illegal activity including fraud, money laundering, gambling, tax evasion, and scams. We or our partners **may be specifically targeted by individuals seeking to conduct fraudulent transfers, and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances**. The use of our platform for illegal or improper purposes **could** subject us to claims, individual and class action lawsuits, and government and regulatory investigations, prosecutions, enforcement actions, inquiries, or requests that could result in liability and reputational harm for us.

129.    Also in the FY'22 10-K, the Company discussed at length its compliance with KYC

and AML regulations in various jurisdictions:

Anti-money laundering and counter-terrorist financing

***We are subject to various anti-money laundering and counter-terrorist financing laws, including the Bank Secrecy Act (the "BSA") in the United States, and similar laws and regulations abroad***.  In the United States, as a money services business registered with the Financial Crimes Enforcement Network ("FinCEN"), the BSA requires us to among other things, develop, implement, and maintain a risk-based anti-money laundering program, provide an anti-money laundering-related training program, report suspicious activities and transactions to FinCEN, comply with certain reporting and recordkeeping requirements, and collect and maintain information about our customers.  In addition, the BSA requires us to comply with certain customer due diligence requirements as part of our anti-money laundering obligations, including developing risk-based policies, procedures, and internal controls reasonably designed to verify a customer's identity.  Many states and other countries impose similar and, in some cases, more stringent requirements related to anti-money laundering and counter-terrorist financing.  ***We have implemented a compliance program designed to prevent our platform from being used to facilitate money laundering, terrorist financing, and other illicit activity in countries, or with persons or entities, included on designated lists promulgated by the Office of Foreign Assets Control ("OFAC") and equivalent foreign authorities***.  Our compliance program includes policies, procedures, reporting protocols, and internal controls, and is designed to address legal and regulatory requirements as well as to assist us in managing risks associated with money laundering and terrorist financing.  Anti-money laundering regulations are constantly evolving and vary from jurisdiction-to-jurisdiction.  We continuously monitor our compliance with anti-money laundering and counter-terrorist financing regulations and industry standards and implement policies, procedures, and controls in light of the most current legal requirements.

130.    In the FY'22 10-K, Coinbase made the following claim regarding current regulatory

proceedings that the Company was facing:

We are ***not presently a party to any other legal or regulatory proceedings*** that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows.

131.    In the FY'22 10-K, the Company made the following statement:

As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and ***we may be subject to inquiries, investigations, and enforcement***

- 53 -

***actions by U.S. and non-U.S. regulators*** and governmental authorities, including those related to sanctions, export control, and ***anti-money laundering*** . . . .

In addition, we are required to comply with laws and regulations related to economic sanctions and export controls enforced by U.S. Department of Commerce's Bureau of Industry and Security, and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators.

132.    The FY'22 10-K contained the following risk disclosure:

Our platform ***may be exploited*** to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. ***If*** any of ***our customers use*** our platform to further such illegal activities, our business could be adversely affected.

133.    On February 21, 2023, the Company hosted an earnings call with investors to discuss the financial results for the 2022 Fiscal Year. During that call, Brian Armstrong, Coinbase's Chief Executive Officer, touted Coinbase's AML and KYC process, stating in pertinent part, as follows:

And there's a number of other rules there that I think just, again, apply the best practices from traditional financial services around ***let's have a great anti-money laundering program and get rid of any kind of wash trading and reasonable kind of KYC procedures and things like that***.

134.    Emilie Choi, the Company's Chief Operating Officer ("COO") also participated in the February 21, 2023 call. During the call, Choi falsely represented that Coinbase's offerings complied with regulations, stating in pertinent part:

In the past quarter, we had a launch in Australia. We have an upcoming launch in Brazil. And we've been very encouraged by the positive regulatory developments in the EU with MiCA and the U.K.'s long-awaited consultation. So you can expect to see us continuing to invest in the U.K. and Europe. They're really important parts of our business.

We're going to lean into working with jurisdictions to help us maximize global coverage, and ***we will always be focused on offering our products in a safe, compliant way with, as you referenced, good risk management and sound audit***. So there's nothing to announce here today, but international continues to be a focus area for us in 2023 and beyond.

135.    Grewal also spoke on the February 21, 2023 call, and stated that Coinbase was "in constant conversation" with regulators, yet failed to disclose that it was being investigated for compliance violations, stating in pertinent part, as follows:

> Coinbase, we have a 10-year plus record of regulatory compliance engagement, and we remain committed to working with regulators to develop solutions that are sensible, that put consumers first and protect them and ultimately help to grow the crypto economy. ***We are in constant conversation with all of these regulators*** and, of course, the policymakers as well, particularly in D.C. In those conversations, our agenda is very clear. . . .

### O.    March 8, 2023 Morgan Stanley Technology, Media & Telecom Conference

136.    On March 8, 2023, Armstrong attended the 2023 Morgan Stanley Technology, Media & Telecom Conference. During the conference, Armstrong misrepresented the effectiveness of Coinbase's AML and KYC program, as reflected in the following exchange with the moderator:

> [Armstrong:] So the U.S. is a little behind here, but the types of legislation that we want pass, it's actually – it's nothing rocket science. It's really just taking some of the best practices and applying it to crypto, whether that's let's make sure we have audited financial. Let's make sure that customer funds and corporate funds . . .

> [Armstrong:] ***Have a great AML KYC program***, avoid wash trading. ***Some of these really basic controls that we can get – now***.

> \*        \*        \*

> [Grimes:] So if you had – if you had someone playing devil's advocate, ***that said, take your scale, compliance, KYC, AML advantages, which are significant. You've built them up***. You were ahead of some industry turmoil. They powered you through it, as a strength and ran further towards existing regulation just as a devil's advocate and said, go meet the SEC where they are on existing rigs on registration complexity and all. What would you say to that hypothesis is a different way to go at it, than either waiting for or precipitating new legislation, which would certainly clear things up. But, what if they don't get cleared up, could you meet them where they live somehow to current regulators?

> [Armstrong:] ***Yes. We're definitely trying to do that***. And we're spending an inordinate amount of time with the SEC, the CFTC, various other state regulators, et cetera, doing exactly that and saying, we've heard the message that coming in register.

**P.    May 4, 2023 Quarterly Report filed on Form 10-Q**

137.    The Company filed its Quarterly Report for the period ended March 31, 2023 with the

SEC on May 4, 2023 (the "Q1'23 10-Q").

138.    The Q1'23 10-Q stated that:

*We are subject to an extensive, highly-evolving, and uncertain regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition*.

*Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate*, including those governing financial services and banking, federal government contractors, trust companies, securities, derivative transactions and markets, broker-dealers and alternative trading systems ("ATS"), commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another.  Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions.  To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on or temporary or permanent suspensions of our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

139.    In the Q1'23 10-Q, the Company made the following statement:

As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and *we may be subject to inquiries, investigations, and*

*enforcement actions by* U.S. and *non-U.S. regulators and governmental authorities*, including those related to sanctions, export control, and *anti-money laundering*.

*In addition, we are required to comply with laws and regulations related to economic sanctions and export controls enforced by the U.S. Department of Commerce's Bureau of Industry and Security, and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators.*

140.    The Q1'23 10-Q contained the following risk disclosure:

Our platform *may be exploited* to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. *If* any of *our customers* use our platform to further such illegal activities, our business could be adversely affected.

141.    In the Q1'23 10-Q, Coinbase made the following claim regarding current regulatory proceedings that the Company was facing:

We are not *presently a party to any other legal or regulatory proceedings* that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows.

**Q.    June 6, 2023 Testimony Before the U.S. House Committee on Agriculture**

142.    On June 6, 2023, Grewal testified before the U.S. House of Representatives Committee on Agriculture, where he misrepresented that Coinbase complies with the Bank Secrecy Act and AML requirements:

In addition to safeguarding customer assets on the platform, Coinbase is focused intently on the prevention and detection of illicit activity and keeping Coinbase customers and the U.S. financial system safe from bad actors. *We have implemented a comprehensive Financial Crimes Compliance program that adheres to U.S. BSA/ AML and sanctions requirements as is required under our existing licenses.* It is also consistent with the standards required of traditional financial institutions.

**R.    August 3, 2023 Quarterly Report Filed on Form 10-Q**

143.    The Company filed its Quarterly Report for the period ended June 30, 2023 with the SEC on August 3, 2023 (the "Q2'23 10-Q").

- 57 -

144.    The Q2'23 10-Q stated that:

*We are subject to an extensive, highly-evolving, and uncertain regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition.*

Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate, including those governing financial services and banking, federal government contractors, trust companies, securities, derivative transactions and markets, broker-dealers and alternative trading systems ("ATS"), commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, web3, generative artificial intelligence ("AI") and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another.  Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions.  To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on or temporary or permanent suspensions of our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

145.    In the Q2'23 10-Q, the Company made the following statement:

As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and *we may be subject to inquiries, investigations, and enforcement actions by U.S. and non-U.S. regulators and governmental authorities, including those related to sanctions, export control, and anti-money laundering*.

\*    \*    \*

- 58 -

In addition, we are required to comply with laws and regulations related to economic sanctions and export controls enforced by the U.S. Department of Commerce's Bureau of Industry and Security, and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators.

146.    The Q2'23 10-Q contained the following risk disclosure:

Our platform ***may be exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams***. ***If*** any of ***our customers use*** our platform to further such illegal activities, our business could be adversely affected.

147.    In the Q2'23 10-Q, Coinbase made the following claim regarding current regulatory proceedings that the Company was facing:

We are ***not presently a party to any other legal or regulatory proceedings*** that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows.

**S.    October 10, 2023 Post on X.com**

148.    On October 10, 2023, Grewal misrepresented Coinbase's compliance with AML and KYC laws, posting on his X (formerly Twitter) account that "@coinbase has been laser-focused on rooting out bad actors seeking to use crypto for illicit purposes. ***We do all we can – KYC checks***, sanctions screening, SAR reporting, strong law enforcement partnerships, you name it – so this doesn't happen on our platform."

**T.    November 2, 2023 Quarterly Report Filed on Form 10-Q**

149.    The Company filed its Quarterly Report for the period ended September 30, 2023 with the SEC on November 2, 2023 (the "Q3'23 10-Q").

150.    The Q3'23 10-Q stated that:

***We are subject to an extensive, highly-evolving, and uncertain regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition***.

- 59 -

*Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate*, including those governing financial services and banking, federal government contractors, trust companies, securities, derivative transactions and markets, broker-dealers and alternative trading systems ("ATS"), commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, web3, generative artificial intelligence ("AI") and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another.  Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions.  To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on or temporary or permanent suspensions of our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

151.    In the Q3'23 10-Q, the Company made the following statement:

As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and we *may be subject to inquiries, investigations, and enforcement actions by U.S. and non-U.S. regulators and governmental authorities, including those related to sanctions, export control, and anti-money laundering*.

In addition, we are required to comply with laws and regulations related to economic sanctions and export controls enforced by U.S. Department of Commerce's Bureau of Industry and Security, and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators.

152.    The Q3'23 10-Q contained the following risk disclosure:

Our platform *may be exploited* to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. *If* any of *our customers use* our platform to further such illegal activities, our business could be adversely affected.

153.    In the Q3'23 10-Q, Coinbase made the following claim regarding current regulatory proceedings that the Company was facing:

We are *not presently a party to any other legal or regulatory proceedings* that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows.

**U.    December 6, 2023 Goldman Sachs Financial Services Conference**

154.    On December 6, 2023, Haas attended the Goldman Sachs Financial Services Conference on behalf of the Company.  During the conference, Haas falsely represented that Coinbase complies with KYC and AML policies and procedures and that Coinbase had more effective compliance procedures than other cryptocurrency exchanges, including Binance, stating in pertinent part, as follows:

So what you saw in the case of Binance was failure for them to comply with what we consider very straightforward compliance obligations. *These AML, BSA rules are no different than what every major financial services institution complies with in the U.S., no different than what Coinbase has complied with since our founding*.

\*        \*        \*

It's clear that everyone needs to be a compliant, trusted counterparty. *And so Coinbase got that right from day 1, and we're really proud of our positioning*.  And because of that positioning from day 1 and because that we have brought a breadth of products and services to market.  We think of it very similar to the early days in the Internet where there was Internet-only companies, i.e., the Amazons of the world that's built up an entire successful business.

**V.    February 15, 2024 Earnings Call and Annual Report on Form 10-K**

155.    The Company filed its Annual Report for Fiscal Year 2023 with the SEC on February 15, 2024 (the "FY'23 10-K").

156.    The FY'23 10-K stated that:

- 61 -

*We are subject to an extensive, highly-evolving and uncertain regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition.*

*Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate*, including those governing financial services and banking, federal government contractors, trust companies, securities, derivative transactions and markets, broker-dealers and alternative trading systems ("ATS"), commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, web3, generative artificial intelligence ("AI") and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another.  Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions.  To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on or temporary or permanent suspensions of our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

157.    In the FY'23 10-K, the Company stated:

Moreover, we invest heavily in compliance tools.  For example, in addition to *robust know-your-customer and anti-money laundering programs*, we employ an industry leading third-party trade surveillance software platform that helps us monitor and detect problematic trading activities on our platform. . . .  We have also invested in a range of technologies that are designed to help identify and prevent harmful activity on our platform, including fraud or account takeovers.

*       *       *

We serve our customers through Electronic Money Institutions authorized by the U.K. Financial Conduct Authority and the Central Bank of Ireland. *We comply with rules and regulations applicable to the European e-money industry, including those related to . . . anti-money laundering*. . . .

\*     \*     \*

Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate, including . . . anti-money laundering, and counter-terrorist financing. . . .

To the extent we have not complied with such laws, rules, and regulations, we *could be* subject to significant fines, revocation of licenses, limitations on or temporary or permanent suspension of our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

\*     \*     \*

As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and we *may be subject to inquiries, investigations, and enforcement actions by U.S. and non-U.S. regulators and governmental authorities, including those related to sanctions, export control, and anti-money laundering*.

As we expand and localize our international activities, we have become increasingly obligated to comply with the laws, rules, regulations, policies, and legal interpretations of both the jurisdictions in which we operate and those into which we offer services on a cross-border basis. For instance, financial regulators outside the United States have increased their scrutiny of crypto asset exchanges over time, such as by requiring crypto asset exchanges operating in their local jurisdictions to be regulated and licensed under local laws. Moreover, laws regulating financial services, the internet, mobile technologies, crypto, and related technologies outside of the United States are highly evolving, extensive and often impose different, more specific, or even conflicting obligations on us, as well as broader liability. In addition, *we are required to comply with* . . . and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators

\*     \*     \*

Our platform *may be exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams*. *If* any of our customers use our platform to further such illegal activities, our business *could be* adversely affected.

- 63 -

Our platform may be exploited to facilitate illegal activity including fraud, money laundering, gambling, tax evasion, and scams. We or our partners may be specifically targeted by individuals seeking to conduct fraudulent transfers, and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances. The use of our platform for illegal or improper purposes *could* subject us to claims, individual and class action lawsuits, and government and regulatory investigations, prosecutions, enforcement actions, inquiries, or requests that could result in liability and reputational harm for us.

158.    In the FY'23 10-K, the Company made the following statement:

When signing up for an account on our platform, among other requirements, consumer and institutional customers must certify that they are at least eighteen (18) years of age (if a natural person), agree to a user agreement, satisfy the requirements of ***our robust know-your-customer ("KYC") program***, and have read our privacy policy.

159.    Also in the FY'23 10-K, the Company discussed at length its compliance with KYC

and AML provisions in various jurisdictions:

Anti-money laundering and counter-terrorist financing

***We are subject to various anti-money laundering and counter-terrorist financing laws, including the Bank Secrecy Act (the "BSA") in the United States, and similar laws and regulations abroad***. In the United States, as a money services business registered with the Financial Crimes Enforcement Network ("FinCEN"), the BSA requires us to among other things, develop, implement, and maintain a risk-based anti-money laundering program, provide an anti-money laundering-related training program, report suspicious activities and transactions to FinCEN, comply with certain reporting and recordkeeping requirements, and collect and maintain information about our customers. In addition, the BSA requires us to comply with certain customer due diligence requirements as part of our anti-money laundering obligations, including developing risk-based policies, procedures, and internal controls reasonably designed to verify a customer's identity. Many states and ***other countries impose similar and, in some cases, more stringent requirements related to anti-money laundering and counter-terrorist financing***. Our compliance program . . . includes policies, procedures, reporting protocols, and internal controls, and is designed to address legal and regulatory requirements as well as to assist us in managing risks associated with money laundering and terrorist financing. . . . Anti-money laundering regulations are constantly evolving and vary from jurisdiction-to-jurisdiction. We continuously monitor our compliance with anti-money laundering and counter-terrorist financing regulations and industry standards and ***implement policies, procedures, and controls in light of the most current legal requirements***.

160.    In the FY'23 10-K, Coinbase made the following claim regarding current regulatory proceedings that the Company was facing:

> We are **not presently a party to any other legal or regulatory proceedings** that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows.

161.    Also on February 15, 2024, the Company held its earnings call for Fiscal Year 2023, during which Haas falsely stated that Coinbase has "best-in-class compliance" and misrepresented Coinbase's compliance efforts, as set forth in the following exchange with an analyst from Oppenheimer & Co., Inc.:

> [Question:] At House Hearing yesterday, Undersecretary confirmed with Congressman Tom Emmer that a report about Hamas using digital assets to raise fund was inaccurate, and crypto was not even a popular tool for terrorists. Even though Chainalysis put a report to correct that record, it doesn't appear that it gets enough attention. So I have 2 questions here. Could you please talk about Coinbase's investments in anti-money laundering program to protect your customers and also your reaction to that conversation?

> [Haas:] Thanks, Owen, and thanks for noticing that. We were really pleased to see that House Hearing yesterday and really pleased with the correction of the record here. One, we have significant investments in AML. **We have a large compliance team that has best-in-class compliance approaches the same as any other fintech or bank. We follow very standard rules in this space and are governed by our MTL licenses and our Bitcoin license with NYDFS. We're really proud to be one of the most compliant crypto companies, frankly, in the world with this regard**.

## W.    February 15, 2024 Testimony Before the U.S. House Committee on Financial Services

162.    Also on February 15, 2024, Grant Rabenn, the Director – Financial Crimes Legal for Coinbase, appeared before the U.S. House of Representatives Committee on Financial Services, where he misrepresented Coinbase's KYC and AML policies and procedures, stating that: "**[w]e apply KYC to our customers when onboarding them, monitor and review transactions for suspicious activity, file SARs, and regularly and proactively engage with law enforcement, even when we are not required to do so**."

**X.    March 6, 2024 Morgan Stanley Technology, Media & Telecom Conference**

163.    On March 6, 2024, Armstrong spoke on behalf of the Company at the Morgan

Stanley Technology, Media & Telecom Conference, and made the following statements:

> [Armstrong:] Well, yes, I mean – so the U.S. is actually a little bit behind.  For instance, Europe has already passed comprehensive crypto legislation.  Much of the rest of the G20 has made progress on this in a way that the U.S. has not yet.  So Coinbase has been very supportive of trying to get regulatory clarity in the U.S.  We're doing this, of course, through the court system itself, in our case, and we feel very optimistic about our chances of winning that case.  But kind of regardless of the outcome, it's going to create clarity through case law.  So that's fine.  We're also working through Congress.

**Y.    May 2, 2024 Quarterly Report Filed on Form 10-Q**

164.    The Company filed its Quarterly Report for the period ended March 31, 2024 with the

SEC on May 2, 2024 (the "Q1'24 10-Q").

165.    The Q1'24 10-Q stated that:

> *We are subject to an extensive, highly-evolving and uncertain regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition*.
>
> *Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate*, including those governing financial services and banking, federal government contractors, trust companies, securities, derivative transactions and markets, broker-dealers and alternative trading systems ("ATS"), commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counterterrorist financing.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, generative artificial intelligence ("AI") and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent

- 66 -

manner from one jurisdiction to another, and may conflict with one another. Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions. To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on or temporary or permanent suspensions of our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

166.    In the Q1'24 10-Q, the Company made the following statement:

As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and *we may be subject to inquiries*, investigations, and enforcement actions by U.S. and non-U.S. regulators and governmental authorities, including those related to sanctions, export control, *and anti-money laundering*.

\*       \*       \*

In addition, we are required to comply with laws and regulations related to economic sanctions and export controls enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of Commerce's Bureau of Industry and Security, *and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators*.

167.    The Q1'24 10-Q contained the following risk disclosure:

Our platform *may be exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. If* any of *our customers use* our platform to further such illegal activities, our business could be adversely affected.

168.    In the Q1'24 10-Q, Coinbase made the following claim regarding current regulatory proceedings that the Company was facing:

We are *not presently a party* to any other legal or regulatory proceedings that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows.

4904-0075-6784.v1

Z.    **May 21, 2024 JP Morgan Global Technology, Media and Communications Conference**

169.    On May 21, 2024, JP Morgan held its Global Technology, Media and Communications Conference.  Choi attended that conference on behalf of the Company, and made the following statement in response to a question from a JP Morgan Chase & Co. analyst about the geographic expansion of Coinbase's cryptocurrency derivative business:

> I think the thing I would say is that the crypto derivatives market that existed with some of the offshore activity that happened before.  Some of that was casino-like behavior.  ***Some of that was non-KYC behavior that we will not participate in***.  And so it's not a one-for-one directly transferable thing when other exchanges go bust or don't play it by the rules.  ***We will always kind of lean into the compliant, secure routes that kind of got us to this place, and we think that there's going to be a very large opportunity there for us***.

170.    Also during the May 21, 2024 conference, Choi engaged in the following exchange with the same analyst from JP Morgan Chase & Co. and misrepresented Coinbase's compliance KYC laws:

> [Question:]  So Emilie, as I think about regulation, and I think about the brand and the position that Coinbase is within the crypto markets.  You are – you have built a brand around being a compliant firm, working with regulators to sort of build and develop these markets.  And I think to some extent, that's worked against you in some instances and worked for you in other instances.  So as we think about the build-out of your business overseas, where many competitors maybe didn't have the level of compliance, how has your brand – how is your brand allowing you to enter these new markets and develop new products?  Is it making life easier to win over regulators?  Or is it making life harder to win over clients who may not want these KYC and reporting responsibilities that you're endeavoring to undertake?

> [Choi:]  For better or for worse, I think, the sins of some of the bad actors have led to a much more regulated environment globally.  ***And so it largely, I think, benefits us because we've always done the hard work of that.  I mean I think we were talking in the other room, Ken, about in 2021 Coinbase was berated for being slow, for having too much compliance***.  Why couldn't we be more like FTX.  How are they operating with 40 people, what was wrong with us?  And we did tons of bottoms up to look at the composition of headcount, how we were doing KYC, could we improve it?  Can we make it more efficient?  And we were scratching our heads, we're like this can't – this doesn't work.  We just – this doesn't compute.

171.     The statements detailed in ¶¶125-170 above were materially false and misleading when made and omitted material information.  The true facts, which were then known to or recklessly disregarded by Defendants, include:

(a)     That CBPL was being investigated by the FCA.

(b)     That CBPL entered into a VREQ with the FCA to ensure improvement in its compliance functions, and repeatedly violated the terms of the VREQ.

(c)     That CBPL did not implement the VREQ by October 31, 2020, as required.

(d)     That until October of 2022, CBPL did not monitor or test the methods it was using to achieve compliance with the VREQ.

(e)     That the FCA's investigation exposed significant deficiencies in the Company's AML and KYC compliance, including:

(i)     "[S]ignificant weaknesses and gaps in the [Company's] financial crime control framework."

(ii)     Between October 31, 2020 and December 18, 2020, CBPL onboarded "4,471 high risk customers" due to gaps in CBPL's KYC controls, nearly 2,800 of which undertook transactions prohibited under the terms of the VREQ.

(iii)     On October 21, 2022, CBPL determined that a further 8,183 customers had been able to access e-money services in violation of the VREQ, due to "ineffective application" of CBPL's compliance plan under the VREQ.  An additional 1,034 high risk customers were allowed to "migrate[]" to CBPL's platform from other Coinbase Group entities, and to access e-money services because no assessment was conducted as to whether their account should be flagged.

(iv)     On March 9, 2023, CBPL identified an additional 182 high-risk customers that were permitted to make 272 separate transactions that were prohibited under the terms of the VREQ, totaling nearly $114,000.

- 69 -

(v)     On September 25, 2023, CBPL determined that it had again breached the terms of the VREQ by allowing 152 high-risk customers, whose accounts had already been flagged, to nevertheless receive currency in their e-money wallets, and to conduct 600 transactions with a total value of £98,000.

(vi)     Between October 31, 2020 and October 1, 2023, CBPL violated the terms of the VREQ six times.  The significance of these breaches was such that CBPL onboarded and/or provided access to payment or e-money services to 13,416 separate high risk customers.  31% of these high risk customers used CVPL to make 12,912 prohibited deposits totaling roughly $24.9 million.  These high risk customers further used CBPL to withdraw these monies, and execute transactions via other Coinbase Group entities totaling approximately $226 million.

172.     Furthermore, the statements referenced in ¶¶128-129, and 157 above were materially false and misleading when made because, contrary to Defendants statements describing Coinbase's "robust know-your-customer and anti-money laundering programs," that Coinbase's "compliance program" was "designed to prevent our platform from being used to facilitate money laundering, terrorist financing, and other illicit activity" and that Coinbase complies with "rules and regulations applicable to the European e-money industry, including those related to . . . anti-money laundering," Defendants knew, or recklessly disregarded, that Coinbase violated KYC and AML laws and regulations in the United Kingdom and were being investigated by the FCA for violations.

173.     Additionally, contrary to Defendants' statements referenced in ¶¶127-128, 130, 132, 140-141, 144, 146-147, 150, 152-153, 156-157, 160, 165, and 167-168 above that Coinbase "may be exploited to facilitate illegal activity," "[i]f any of our customers use our platform to further such illegal activities, our business could be adversely affected," that Coinbase was "not presently a party to any other legal or regulatory proceedings," and to the extent Coinbase has "not complied with such laws, rules, and regulations," it "could be subject to significant fines," Defendants knew, or

recklessly disregarded, that Coinbase was being exploited to facilitate illegal activity, its customers used Coinbase's platform to further illegal activities, and Coinbase was being investigated by the FCA.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Financial Regulators Repeatedly Notified Defendants that Coinbase was Violating KYC/AML Regulations

174.    Prior to and throughout the Class Period, Defendants were directly notified by financial regulators that the Company was violating KYC and AML laws and regulations and that there were serious deficiencies in Coinbase's KYC and AML compliance functions.  Defendants also repeatedly acknowledged the existence and severity of the Coinbase's KYC and AML compliance failures to those regulators, while at the same time concealing from investors the extent and severity of the deficiencies, and misleading investors to believe that any deficiencies had been remedied.

### 1.    The New York State Department of Financial Services Communicated Frequently with the Company Regarding Its AML/KYC Deficiencies Under New York State Law

175.    In May 2020, the Department performed an examination of the safety and soundness of Coinbase's operation for the period July 1, 2018 through December 31, 2019.  At that time, the Department notified Coinbase of series deficiencies in the Company's compliance function.  This examination exposed "[serious] deficiencies across Coinbase's compliance program, including its Know-Your-Customer/Customer Due Diligence ('KYC/CCD') procedures . . . .  The examination also found that Coinbase failed to conduct annual Anti-Money Laundering ("AML") risk assessments" in violation of New York State law.  The examination culminated in a report that was transmitted to Coinbase's leadership in September 2020.  That report identified numerous significant deficiencies across Coinbase's compliance program, including but not limited to, significant deficiencies in Coinbase's know-your-customer/customer due diligence (KYC/CDD) procedures,

- 71 -

failure to maintain and adequate transaction monitoring system (TMS) and Office of Foreign Assets Control (OFAC) screening programs, and failure to conduct annual AML risk assessments and validation review of the TMS system.

176.    As a result of the 2020 examination, the Department required Coinbase to, among other things, hire an independent consultant to assess Coinbase's compliance with anti-money laundering laws including the Bank Secrecy Act ("BSA").  The Department then launched an enforcement investigation in 2021 into the Company's compliance deficiencies that were identified during the 2020 examination, and to determine if any "legal violations had occurred" as a result of those deficiencies.

177.    After being made aware of these deficiencies by the Department, "Coinbase made commitments to . . .  improve its BSA/AML . . . compliance programs."  As part of this improvement, the Company claimed it had "developed a remediation plan and took steps toward improving its Compliance Program."

178.    Despite these commitments, "substantial weaknesses remained" over the course of the Department's enforcement investigation, and "it became clear that Coinbase's compliance system was inadequate to handle the growing volume of Coinbase's business."  Indeed, the Department found that, by the end of 2021, the Company had a backlog of over 14,000 customers requiring EDD.

179.    The continued deficiencies were such that the Department "determined that the Coinbase compliance program required further intervention," and the Department entered into a Memorandum of Understanding ("MOU") with the Company on February 10, 2022 under which Coinbase was required to retain an independent monitor to "assist the Company in addressing deficiencies."  While working with the independent monitor, Coinbase "continue[d] to report its progress" to the Department.

- 72 -

180.    Throughout the Department's examination and investigation process, there was "active engagement" between the Department and the Company.  On January 4, 2023, the Company entered into a settlement with the Department for $100 million, $50 million of which was required to be spent over the next two years on further remediation efforts, under the continued supervision of the independent monitor.  The terms of the settlement also required that Coinbase provide quarterly updates to the Department regarding its progress.

    2.    **The UK Financial Conduct Authority Also Repeatedly Notified Defendants that Coinbase Was Violating British KYC/AML Regulations**

181.    In February of 2020, the FCA conducted an inspection of the compliance of CBPL, and found "significant weaknesses and gaps in the Firm's financial crime control framework."  The FCA notified CBPL of its findings in a letter issued on April 30, 2020.

182.    Following the February inspection and the receipt of the April 30, 2020 letter, CBPL submitted a "detailed plan to address" the FCA's feedback, with the objective of completing remedial work by the end of 2020.  The FCA and CBPL attended a meeting on July 31, 2020, where the two parties discussed the FCA's concerns regarding CBPL's "financial crime systems and controls" and whether the firm should be restricted from onboarding any new "high risk customers." CBPL voluntarily agreed to cease onboarding of new high-risk institutional customers starting on August 6, 2020.

183.    In August of 2020, CBPL was again in contact with the FCA in order to notify the agency that it was "working with its engineers" to attain compliance with FCA regulations.

184.    On October 29, 2020, CBPL entered into the VREQ with the FCA, which is a tool used by the FCA to ensure compliance and mitigate risks.  The VREQ went into effect on October 30, 2020.

185.    On January 20, 2021, following a breach of the terms of the VREQ in which CBPL had onboarded an additional 4,471 high-risk customers, 2,737 of which undertook prohibited transactions totaling $6.82 million, the FCA contacted CBPL, and re-emphasized the terms of the VREQ and the importance of full compliance with the terms of the agreement.

186.    On October 21, 2022, CBPL notified the FCA of another breach of the VREQ. Following this second breach, CBPL undertook a review of its compliance with the VREQ, and produced a report dated December 1, 2022, which documented, in part, that "the controls implementing the VREQ have not been formally documented."

187.    The terms of the VREQ were breached four more times, and each time CBPL notified the FCA, once on January 18, 2023, March 9, 2023, September 25, 2023, and October 1, 2023. According to the FCA's assessment of these communications, as a result of these breaches, CBPL onboarded and/or provided e-money services to 13,416 separate high risk customers, permitting 12,912 prohibited deposits worth nearly $25 million, and thereby facilitated cryptoasset transactions to other Coinbase entities totaling $226 million.  CBPL reported 62 of the 13,416 customers to law enforcement in connection with potential money laundering, scams and fraud, and the sale of illicit substances and stolen credit card information on the darknet.

188.    On July 23, 2024, the FCA imposed on CBPL a financial penalty of £3,303546 for the continued violation of the VREQ.  At the time that the penalty was imposed, the FCA noted the egregiousness of the violations given, among other things, the "significant engagement" between FCA and the CBPL in developing the terms of the VREQ.

**B.    The Individual Defendants' Nearly $1.3 Billion Insider Sales**

189.    The Individual Defendants capitalized on their fraud by collectively selling more than 5.4 million of their Coinbase shares during the Class Period for insider trading proceeds of $1,292,825.166.    While investors remained unaware of the numerous, serious and ongoing

- 74 -

deficiencies in the Company's KYC/AML compliance identified by both the New York Department of Financial Services and the FCA, and while Defendants falsely touted the Company's strong compliance with KYC/AML regulations, Defendants Armstrong, Haas, Choi, Chatterjee, Grewal, and Jones repeatedly sold their Coinbase stock, at times selling multiple times per month, for astronomical personal profits.

190.    On April 14, 2021, the first day of the Class Period, Coinbase listed nearly 115 million shares of its common stock on the NASDAQ Global Select Market.  On that same day, Individual Defendants Armstrong, Haas, Choi, Chatterjee, Grewal, and Jones collectively sold nearly 2 million of their Coinbase shares, for total single-day proceeds of nearly *$730 million*.

191.    These Individual Defendants continued to engage in trades that were unusual and suspicious throughout the Class Period, reaping nearly $1.3 billion in total proceeds.

192.    *Armstrong*: Armstrong sold prolifically throughout the Class Period.  On April 14, 2021, the day of Coinbase's IPO (and the day of Defendants' first allegedly false statements), he made his biggest Class Period sale, selling nearly 750,000 shares for proceeds of nearly *$300 million*.  All told, during the Class Period, Armstrong sold more than 2.5 million shares on 50 separate dates, for proceeds of nearly *$560 million*:

| Armstrong Insider Sales During the Class Period | | |
|---|---|---|
| Transaction Date | Shares Sold | Proceeds |
| 14-Apr-2021 | 749,999 | $ 291,827,965.50 |
| 11-Nov-2022 | 29,732 | $ 1,625,092.43 |
| 21-Nov-2022 | 14,866 | $ 624,400.36 |
| 05-Dec-2022 | 14,866 | $ 696,714.92 |
| 20-Dec-2022 | 14,866 | $ 524,931.16 |
| 04-Jan-2023 | 14,866 | $ 547,689.60 |
| 13-Jan-2023 | 58,053 | $ 2,906,133.18 |
| 17-Jan-2023 | 31,143 | $ 1,644,775.95 |
| 30-Jan-2023 | 29,732 | $ 1,742,683.01 |

| 02-Feb-2023 | 44,598 | $ | 3,537,820.30 |
| 14-Feb-2023 | 29,732 | $ | 1,719,393.78 |
| 01-Mar-2023 | 29,732 | $ | 1,916,499.38 |
| 13-Mar-2023 | 29,732 | $ | 1,710,400.50 |
| 17-Mar-2023 | 28,026 | $ | 2,116,128.10 |
| 20-Mar-2023 | 1,706 | $ | 128,473.44 |
| 27-Mar-2023 | 29,730 | $ | 1,868,836.98 |
| 10-Apr-2023 | 29,730 | $ | 1,860,456.19 |
| 24-Apr-2023 | 29,730 | $ | 1,649,896.80 |
| 08-May-2023 | 29,730 | $ | 1,681,479.78 |
| 24-May-2023 | 29,730 | $ | 1,715,758.72 |
| 05-Jun-2023 | 29,730 | $ | 1,780,716.46 |
| 20-Jun-2023 | 29,730 | $ | 1,664,695.74 |
| 03-Jul-2023 | 29,730 | $ | 2,348,921.21 |
| 05-Jul-2023 | 44,595 | $ | 3,480,950.74 |
| 13-Jul-2023 | 27,587 | $ | 2,875,895.71 |
| 18-Jul-2023 | 59,460 | $ | 6,284,228.42 |
| 01-Aug-2023 | 29,725 | $ | 2,740,714.66 |
| 16-Nov-2023 | 18,500 | $ | 1,782,998.40 |
| 20-Nov-2023 | 4,625 | $ | 480,632.40 |
| 24-Nov-2023 | 23,075 | $ | 2,634,693.66 |
| 28-Nov-2023 | 50,000 | $ | 6,259,500.00 |
| 04-Dec-2023 | 23,075 | $ | 3,274,103.98 |
| 12-Dec-2023 | 23,075 | $ | 3,212,093.11 |
| 13-Dec-2023 | 9,153 | $ | 1,373,041.53 |
| 14-Dec-2023 | 90,847 | $ | 13,818,586.71 |
| 02-Jan-2024 | 23,075 | $ | 3,777,709.41 |
| 11-Jan-2024 | 23,075 | $ | 3,372,161.59 |
| 01-Feb-2024 | 23,075 | $ | 2,978,262.45 |
| 12-Feb-2024 | 23,075 | $ | 3,392,758.47 |
| 27-Feb-2024 | 250,000 | $ | 51,331,518.90 |
| 04-Mar-2024 | 23,075 | $ | 5,173,183.57 |
| 08-Mar-2024 | 250,000 | $ | 64,968,314.76 |
| 11-Mar-2024 | 23,075 | $ | 6,103,631.77 |
| 04-Apr-2024 | 23,075 | $ | 5,914,223.83 |
| 15-Apr-2024 | 23,075 | $ | 5,497,939.05 |
| 03-May-2024 | 23,075 | $ | 5,171,888.04 |
| 13-May-2024 | 23,075 | $ | 4,662,768.81 |
| 03-Jun-2024 | 23,075 | $ | 5,327,558.60 |
| 10-Jun-2024 | 23,075 | $ | 5,724,496.68 |
| 01-Jul-2024 | 46,150 | $ | 10,414,592.45 |
| **Totals** | **2,586,256** | **$** | **559,868,311.19** |

4904-0075-6784.v1

193.    Armstrong's Class Period sales represented 7.4% of his total holdings.

194.    **Haas**:  On the first day of the Class Period, Haas likewise engaged in her largest sale of the Class Period, unloading more than 250,000 shares of Coinbase stock for proceeds of nearly ***$100 million***.  Haas' second largest single-day sales occurred on March 5, 2024, when she sold 64,000 shares for proceeds of nearly $15 million, just weeks after she told investors at the April 15, 2024 FY'23 conference call that the Company "follow[ed] very standard rules" when it came to compliance with AML and KYC, and touted that Coinbase was "one of the most compliant crypto companies . . . in the world. . . ."  Haas sold more than 750,000 shares, for total Class Period proceeds of more than ***$140 million***:

| Haas Insider Sales During the Class Period | | |
|---|---|---|
| **Transaction Date** | **Shares Sold** | **Proceeds** |
| 14-Apr-2021 | 255,500 | $      99,320,793.18 |
| 22-Nov-2022 | 116,608 | $        4,948,632.57 |
| 13-Dec-2022 | 92,000 | $        4,168,711.56 |
| 27-Dec-2022 | 94,000 | $        3,179,955.14 |
| 10-Jan-2023 | 88,000 | $        3,390,232.00 |
| 13-Dec-2023 | 1,000 | $           150,000.00 |
| 22-Dec-2023 | 1,000 | $           175,000.00 |
| 05-Mar-2024 | 64,000 | $      14,621,088.59 |
| 08-Mar-2024 | 18,000 | $        4,500,000.00 |
| 15-Mar-2024 | 4,750 | $        1,070,412.50 |
| 15-Apr-2024 | 4,200 | $        1,039,663.24 |
| 15-May-2024 | 5,000 | $        1,060,728.00 |
| 20-May-2024 | 3,880 | $           824,758.78 |
| 17-Jun-2024 | 8,850 | $        2,071,003.50 |
| **Totals** | **756,788** | **$      140,520,979.06** |

195.    Haas's Class Period sales represented ***74.9%*** of her total holdings.

196.    **Choi**: Choi likewise engaged in her largest sale of the Class Period on April 14, 2021, when she sold more than 600,000 shares of Coinbase stock for proceeds of nearly ***$220 million***.  All

told, Choi sold nearly 1 million shares of Coinbase stock during the Class Period for total proceeds

of more than *$300 million*:

| Choi Insider Sales During the Class Period | | |
|---|---|---|
| Transaction Date | Shares Sold | Proceeds |
| 14-Apr-2021 | 602,158 | $  219,775,751.54 |
| 15-Apr-2021 | 12,012 | $  4,192,188.00 |
| 25-Oct-2021 | 29,914 | $  9,694,082.56 |
| 30-Nov-2021 | 5,804 | $  1,880,496.00 |
| 01-Dec-2023 | 8,000 | $  1,011,120.00 |
| 14-Dec-2023 | 1,500 | $  228,150.00 |
| 29-Dec-2023 | 1,500 | $  279,090.00 |
| 02-Jan-2024 | 8,000 | $  1,386,560.00 |
| 16-Jan-2024 | 1,500 | $  193,725.00 |
| 31-Jan-2024 | 1,500 | $  193,965.00 |
| 01-Feb-2024 | 7,300 | $  939,296.00 |
| 02-Feb-2024 | 700 | $  91,205.00 |
| 14-Feb-2024 | 1,500 | $  227,160.00 |
| 27-Feb-2024 | 100,000 | $  20,380,651.76 |
| 28-Feb-2024 | 1,500 | $  314,115.00 |
| 01-Mar-2024 | 8,000 | $  1,628,441.28 |
| 08-Mar-2024 | 100,000 | $  24,949,000.00 |
| 14-Mar-2024 | 1,500 | $  367,500.00 |
| 28-Mar-2024 | 1,500 | $  390,000.00 |
| 01-Apr-2024 | 8,000 | $  2,062,883.00 |
| 15-Apr-2024 | 1,500 | $  372,000.00 |
| 30-Apr-2024 | 1,500 | $  322,500.00 |
| 01-May-2024 | 8,000 | $  1,666,802.60 |
| 14-May-2024 | 1,500 | $  293,850.00 |
| 20-May-2024 | 13,155 | $  2,799,235.43 |
| 31-May-2024 | 1,500 | $  358,635.00 |
| 03-Jun-2024 | 8,000 | $  1,841,449.72 |
| 14-Jun-2024 | 1,500 | $  369,240.00 |
| 28-Jun-2024 | 1,500 | $  335,925.00 |
| 01-Jul-2024 | 8,000 | $  1,857,961.87 |
| 15-Jul-2024 | 1,500 | $  344,550.00 |
| **Totals** | **949,543** | **$  300,747,529.76** |

197.    Choi's Class Period sales represented 48.3% of her holdings.

198.    *Grewal*: Grewal sold more than 500,000 shares of Coinbase stock during the Class

Period for proceeds north of ***$112 million***:

| Grewal Insider Sales During the Class Period | | |
|---|---|---|
| Transaction Date | Shares Sold | Proceeds |
| 31-Aug-2021 | 46,289 | $    11,991,101.65 |
| 01-Sep-2021 | 46,287 | $    12,337,314.29 |
| 22-Sep-2021 | 41,288 | $     9,952,432.91 |
| 23-Sep-2021 | 41,287 | $     9,876,375.19 |
| 20-Oct-2021 | 24,937 | $     7,808,300.83 |
| 21-Oct-2021 | 24,936 | $     7,602,309.80 |
| 08-Nov-2021 | 10,900 | $     3,815,000.00 |
| 22-Nov-2021 | 4,363 | $     1,402,889.49 |
| 25-Feb-2022 | 1,207 | $       209,861.09 |
| 23-May-2022 | 1,090 | $        73,313.40 |
| 25-Nov-2022 | 1,818 | $        80,701.02 |
| 02-Feb-2023 | 1,818 | $       140,095.08 |
| 27-Feb-2023 | 2,325 | $       138,154.52 |
| 20-Mar-2023 | 1,485 | $       114,345.00 |
| 21-Mar-2023 | 840 | $        64,713.60 |
| 25-May-2023 | 1,818 | $       103,529.94 |
| 03-Jul-2023 | 1,818 | $       140,058.72 |
| 13-Jul-2023 | 11,922 | $     1,193,869.08 |
| 14-Jul-2023 | 3,573 | $       393,280.11 |
| 25-Aug-2023 | 2,402 | $       177,917.56 |
| 29-Aug-2023 | 2,402 | $       185,026.06 |
| 27-Nov-2023 | 29,607 | $     3,479,819.32 |
| 29-Nov-2023 | 10,000 | $     1,300,900.00 |
| 04-Dec-2023 | 10,000 | $     1,450,900.00 |
| 19-Dec-2023 | 10,000 | $     1,575,900.00 |
| 20-Dec-2023 | 10,000 | $     1,657,102.08 |
| 26-Dec-2023 | 10,000 | $     1,737,658.25 |
| 27-Dec-2023 | 15,000 | $     2,701,050.00 |
| 25-Jan-2024 | 10,000 | $     1,210,213.62 |
| 26-Feb-2024 | 42,113 | $     8,015,890.33 |
| 27-Feb-2024 | 25,000 | $     5,126,000.00 |
| 25-Mar-2024 | 20,257 | $     5,041,469.87 |
| 20-May-2024 | 11,355 | $     2,415,270.93 |

4904-0075-6784.v1

| | | | |
|---|---|---|---|
| 28-May-2024 | 17,444 | $ | 4,170,398.85 |
| 25-Jun-2024 | 10,000 | $ | 2,194,450.89 |
| 25-Jul-2024 | 10,000 | $ | 2,357,496.93 |
| **Totals** | **515,581** | **$** | **112,235,110.41** |

199.    Grewal's Class Period sales represented 68.6% of his total holdings.

200.    *Chatterjee*: Like Armstrong, Haas, and Choi, Chatterjee also engaged in his largest sale, by far, on the first day of the Class Period, when he sold 160,000 shares for proceeds of nearly *$62 million* on April 14, 2021.  During the Class Period, Chatterjee sold a total of 320,000 shares of Coinbase stock for a total of more than *$110 million*:

| Chatterjee Insider Sales During the Class Period | | |
|---|---|---|
| **Transaction Date** | **Shares Sold** | **Proceeds** |
| 14-Apr-2021 | 160,000 | $    61,885,000.00 |
| 02-Sep-2021 | 20,000 | $      5,435,851.58 |
| 05-Oct-2021 | 10,000 | $      2,380,000.00 |
| 11-Oct-2021 | 10,000 | $      2,630,000.00 |
| 18-Oct-2021 | 10,000 | $      2,950,100.00 |
| 20-Oct-2021 | 10,000 | $      3,130,100.00 |
| 02-Nov-2021 | 40,000 | $    13,498,843.41 |
| 08-Nov-2021 | 20,000 | $      7,105,800.00 |
| 02-Dec-2021 | 30,000 | $      8,767,654.43 |
| 04-Jan-2022 | 10,000 | $      2,534,100.00 |
| **Totals** | **320,000** | **$    110,317,449.42** |

201.    Chatterjee's Class Period sales represented 19.4% of his total holdings.

202.    *Jones*: Jones, likewise, engaged in her largest sale of the Class Period on April 14, 2021, when she sold 110,000 shares for total proceeds of more than *$43 million*.  In total, she sold nearly 300,000 shares for total proceeds of nearly $70 million:

| Jones Insider Sales During the Class Period | | |
|---|---|---|
| **Transaction Date** | **Shares Sold** | **Proceeds** |
| 14-Apr-2021 | 110,000 | $43,435,000.00 |
| 12-Aug-2021 | 4,918 | $1,275,616.41 |
| 23-Aug-2021 | 1,029 | $  270,627.00 |

| | | |
|---|---|---|
| 01-Sep-2021 | 796 | $ 207,270.44 |
| 05-Oct-2021 | 450 | $ 107,550.00 |
| 06-Oct-2021 | 346 | $ 86,154.00 |
| 25-Oct-2021 | 11,191 | $3,626,667.37 |
| 01-Nov-2021 | 796 | $ 258,381.60 |
| 22-Nov-2021 | 1,028 | $ 342,858.56 |
| 01-Dec-2021 | 796 | $ 253,605.60 |
| 03-Jan-2022 | 796 | $ 203,959.08 |
| 11-Aug-2022 | 4,512 | $ 438,746.88 |
| 24-Aug-2022 | 2,177 | $ 156,744.00 |
| 23-Nov-2022 | 2,175 | $ 95,373.75 |
| 23-Feb-2023 | 8,197 | $ 509,222.85 |
| 02-Jun-2023 | 1,704 | $ 110,760.00 |
| 27-Jun-2023 | 74,375 | $5,206,250.00 |
| 03-Jul-2023 | 7,335 | $ 550,125.00 |
| 13-Jul-2023 | 9,897 | $ 989,700.00 |
| 24-Aug-2023 | 1,704 | $ 132,503.04 |
| 24-Nov-2023 | 1,704 | $ 184,798.80 |
| 13-Dec-2023 | 1,838 | $ 275,700.00 |
| 20-Feb-2024 | 290 | $ 52,200.00 |
| 26-Feb-2024 | 1,624 | $ 274,050.00 |
| 27-Feb-2024 | 26,365 | $ 404,825.00 |
| 20-May-2024 | 2,925 | $ 621,974.91 |
| 30-May-2024 | 15,580 | $3,727,912.90 |
| 03-Jun-2024 | 450 | $ 104,670.00 |
| 05-Jun-2024 | 526 | $ 130,974.00 |
| 01-Jul-2024 | 450 | $ 101,565.00 |
| **Totals** | **295,974** | **$69,135,786.19** |

203.    Jones's Class Period sales represented 99.1% - or virtually all - of her holdings.

204.    Collectively, Defendants Armstrong, Haas, Choi, Grewal, Chatterjee, and Jones sold more than 5.3 million shares of Coinbase stock, ***for proceeds of nearly $1.3 billion***.

C.    **Defendants Understood and Repeatedly Emphasized the Importance of Complying with AML/KYC Regulations to Coinbase's Business**

205.    Because the fraud alleged involved the Company's AML and KYC obligations, which were crucial to the Company's Class Period operations, a strong inference arises that Defendants were aware of and participated in that fraud.  Prior to and throughout the Class Period,

Defendants knew that the success of Coinbase's business hinged upon its ability to build and maintain effective security and protections for its customers, and to comply with regulatory requirements. In fact, Coinbase claimed on its website during the Class Period that:

> Trust is foundational to our work, and [assures investors that it has] developed sophisticated compliance tools to meet global regulatory requirements. [Coinbase also proclaims that] *[a]dhering to global and local regulations, including those related to anti-money laundering, is a core part of our business* [and that by] holding a high standard for who has access to our products, we've been able to create an ecosystem of trust. [More specifically, Coinbase represents that the Company's] identity verification (IDV) platform is a critical component of our overarching know-your-customer (KYC) program and is designed to accurately verify that users are who they say they are.

206.    The Company also maintains that "[i]dentity verification is a key part of our regulatory compliance program, and we have built a robust architecture that roots out suspicious users." Coinbase also assures investors that the Company's "system prioritizes accuracy and adherence to the law across our global regulatory landscape." Coinbase further represents that "[a] strong compliance foundation *is critical* to Coinbase's mission of being the most trusted crypto platform," and that, "[t]o this end, we have developed a Compliance Program that is rooted in best practices from traditional financial services as well as innovative, sophisticated compliance technology to bring the crypto industry forward."

207.    Coinbase's S-1 stated that "[w]e have a trusted platform owing to our heritage of security and culture of regulatory compliance," and that "[w]e are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition."

208.    As Coinbase also admitted in its S-1:

We operate globally in a complex and rapidly evolving regulatory environment and are subject to a wide range of laws and regulations enacted by U.S. federal, state, and local and foreign governments, and regulatory authorities. Globally, we are subject to increasingly strict legal and regulatory requirements relating to the detection and

prevention of countering terrorist financing, anti-money laundering, fraud, and other illicit activity, the regulation of competition, economic and trade sanctions, privacy, cybersecurity, information security, and data protection.

209.    In the wake of the Company's $100 million settlement with the Department on January 4, 2023, Coinbase and Grewal publicly acknowledged the importance of renewed and sustained commitment to compliance with AML and KYC regulations, stating: "[w]e view this resolution as a critical step in our commitment to continuous improvement, our engagement with key regulators, and our push for greater compliance in the crypto space – for ourselves and others."

210.    Defendants also recognized the importance of compliance with AML and KYC regulations, both in the United States and abroad, multiple times throughout the Class Period while testifying before United States lawmakers.  On December 8, 2021, Haas stated before the U.S. House of Representatives that, while "Coinbase implements a robust Anti-Money Laundering (AML) program . . . there is a very real problem that a small group of non-compliant foreign exchanges are the venues used by criminal actors to cash out their illicit gains, and those foreign exchanges use jurisdictional arbitrage to avoid U.S. regulations."  And on June 6, 2023, Grewal, in testifying before Congress, reassured lawmakers that "Coinbase is *focused intently* on the prevention and detection of illicit activity and keeping Coinbase customers and the U.S. financial system safe from bad actors."  Finally, on February 15, 2024, Rabenn again explained to Congress that: "[i]nternationally, we are also subject to regulatory supervision in a number of markets, including the United Kingdom, European Union, and Singapore; these *regulators also have a heavy focus on financial crimes and mandate implementation of strong AML programs*."

## VIII.  LOSS CAUSATION

211.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic losses.  The market for Coinbase's common stock was open, well-developed, and efficient during the Class Period.  Throughout the Class Period,

Coinbase's stock traded at artificially inflated prices as a direct result of the Defendants' false and misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired Coinbase stock relying upon the integrity of the market price for Coinbase's stock and market information on Coinbase, and have been damaged thereby.

212.    The Class Period inflation in the price of Coinbase stock price was removed when information concealed by the Defendants' false or misleading statements and omissions was revealed to the market through a series of partial disclosures, as more particularly described below. The relevant stock price declines were due to Company-specific, fraud-related disclosures and were not the result of market, industry, or firm-specific, non-fraudulent factors. When the Defendants' prior misrepresentations and fraudulent conduct was revealed to the market, the price of Coinbase common stock declined, as the prior artificial inflation came out of the stock's price.

213.    Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, as a result of their purchases of Coinbase common stock at artificially inflated prices during the Class Period. The economic loss suffered by Plaintiffs and the other Class members was a direct and foreseeable result of the nature and extent of the Defendants' false and misleading statements and omissions being revealed to investors and the market.

A.    **February 24, 2022 Disclosure**

214.    On February 24, 2022, after the market closed, the Company issued its FY'21 10-K, which disclosed for the first time that Coinbase was being investigated by the NYDFS for violations of the Bank Secrecy Act and other rules and regulations, stating in pertinent part, as follows:

> Our subsidiary, Coinbase, Inc., which holds a Bitlicense from the NYDFS and is therefore subject to examinations and investigations by the NYDFS, is currently subject to an investigation by the NYDFS relating to its compliance program including compliance with the Bank Secrecy Act and sanctions laws, cybersecurity, and customer support.

215.    As a result of the disclosures on February 24, 2022, the price of Coinbase common stock dropped from its close of $179.56 per share on February 24, 2022, to $176.83 per share on February 25, 2022, on heavy trading volume of over 6.8 million shares.  However, because Defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Coinbase stock remained artificially inflated.

B.    **January 4, 2023 Disclosure**

216.    On January 4, 2023, NYDFS issued a press release announcing the "$100 Million Settlement with Coinbase, Inc. after DFS Investigation Finds Significant Failings in the Company's Compliance Program."  The press release stated, in pertinent part, as follows:

>    Superintendent of Financial Services Adrienne A. Harris announced today that Coinbase, Inc. ("Coinbase") will pay a $50 million penalty to New York State for significant failures in its compliance program that violated the New York Banking Law and the New York State Department of Financial Services' (DFS) virtual currency, money transmitter, transaction monitoring, and cybersecurity regulations.  These failures made the Coinbase platform vulnerable to serious criminal conduct, including, among other things, examples of fraud, possible money laundering, suspected child sexual abuse material-related activity, and potential narcotics trafficking.  In addition to the penalty, Coinbase has agreed to invest an additional $50 million in its compliance function over the next two years to remediate the issues and to enhance its compliance program pursuant to a plan approved by DFS.

>    "It is critical that all financial institutions safeguard their systems from bad actors, and the Department's expectations with respect to consumer protection, cybersecurity, and anti-money laundering programs are just as stringent for cryptocurrency companies as they are for traditional financial services institutions," said Superintendent Harris.  "Coinbase failed to build and maintain a functional compliance program that could keep pace with its growth.  That failure exposed the Coinbase platform to potential criminal activity requiring the Department to take immediate action including the installation of an Independent Monitor."

>    Coinbase has been licensed by the Department to conduct a virtual currency business and money transmitting business in the State of New York since 2017. Following an examination and subsequent enforcement investigation, the Department found that Coinbase's Bank Secrecy Act/Anti-Money Laundering program – including its Know Your Customer/Customer Due Diligence ("KYC/CDD"), Transaction Monitoring System ("TMS"), suspicious activity reporting, and

- 85 -

4904-0075-6784.v1

sanctions compliance systems – were inadequate for a financial services provider of Coinbase's size and complexity.

- During much of the relevant period, Coinbase's KYC/CDD program, both as written and as implemented, was immature and inadequate. Coinbase treated customer onboarding requirements as a simple check-the-box exercise and failed to conduct appropriate due diligence.

- Coinbase was unable to keep pace with the growth in the volume of alerts generated by its TMS. By late 2021, Coinbase's failure to keep pace with its alerts resulted in a significant and growing backlog of over 100,000 unreviewed transaction monitoring alerts.

- One consequence of Coinbase's failed TMS was that as uninvestigated TMS alerts languished for months in the backlog, Coinbase routinely failed to timely investigate and report suspicious activity as required by law. The Department's investigation found numerous examples of SARs filed months after the suspicious activity was first known to Coinbase.

In light of the state of Coinbase's compliance system, in early 2022, during the course of the investigation, the Department took the extraordinary step of installing an Independent Monitor to immediately evaluate the situation and begin working with Coinbase to fix the outstanding issues. Under the terms of the Consent Order, the Independent Monitor will continue to work with Coinbase for an additional year, extendable at the Department's sole discretion. In direct response to the Department's findings and swift action, Coinbase has begun to remediate many of the referenced issues and to build a more effective and robust compliance program under the supervision of DFS and the DFS-appointed Independent Monitor.

217.    The January 4, 2023 press release also attached a copy of the Consent Order between the Department and Coinbase.

218.    On January 4, 2023, the Company and Grewal released a statement in response to the Department's press release and regarding Coinbase's continuing commitment to compliance with AML and KYC laws and regulations:

We are grateful for our partnership with the NYDFS since we received our BitLicense in 2017 and are proud of our collaboration with regulators more broadly. In particular, we are proud that law enforcement looks to Coinbase for expertise in fighting crypto-related financial crime. ***We routinely conduct proactive investigations to remove bad actors from our platform and work with law enforcement to ensure they are brought to justice***.

\*       \*       \*

- 86 -

*Coinbase remains committed to being a leader and role model in the crypto space, and this means partnering with regulators when it comes to compliance and other areas*.  We believe our investment in compliance outpaces every other crypto exchange anywhere in the world, and that our customers should feel safe and protected while using our platforms.  And although we have not always been perfect, our goal has always been and will always be to build the most trusted, compliant, and secure crypto exchange in the world.  Our customers deserve nothing less.

219.    In response to these January 4, 2023 disclosures, the price of Coinbase common stock declined from its close of $33.60 per share on January 3, 2023, to $33.26 per share on January 6, 2023, on heavy trading volume of over 50 million shares.  However, because Defendants failed to disclose the full truth, and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Coinbase stock remained artificially inflated.

**C.    July 25, 2024 Disclosure**

220.    On July 25, 2024, the FCA issued a press release entitled "FCA takes first enforcement action against firm enabling cryptoasset trading" in which they disclosed that "CB Payments Limited (CBPL) has been fined £3,503,546 by the Financial Conduct Authority (FCA) for repeatedly breaching a requirement that prevented the firm from offering services to high-risk customers" and attached the Final Notice which set forth the factual and legal findings of FCA and the reasons for the CBPL fine.

221.    On July 25, 2024, before the market opened, Bloomberg published a report entitled "Coinbase Unit Fined for Enabling Cryptoasset Trading by UK."  The article stated that:

> A unit of Coinbase Global Inc. was fined £3.5 million ($4.5 million) by the UK for offering cryptoasset trading services to high risk customers – in the first move of its kind from the regulator that's grappling with money laundering controls in digital currencies.

> The Financial Conduct Authority said Thursday that CB Payments Limited had repeatedly broken a voluntary agreement by providing services to 13,416 high risk customers, with around 31% of them depositing around $25 million.  The funds were then used to make transactions via Coinbase Group entities worth around $226 million, they said.

"We believe our investment in compliance stands out in the market as one of the highest, and that our customers should feel safe and protected when using our platforms," Coinbase said in a blog post.

CBPL does not offer cryptoasset transactions but acts as a gateway for customers to trade through other entities within the Coinbase Group.  The FCA agreement was put in place in October 2020 after concerns about the firm's financial controls.

Coinbase doesn't publicly say how many customers it has in the UK, but the nation is its second largest market after the US.  It has an e-money license and is on the FCA's anti-money laundering register for cryptoasset businesses.

"The money laundering risks associated with crypto are obvious and firms must take them seriously," Therese Chambers, joint executive director of enforcement and market oversight at the FCA, said.

222.     Also on July 25, 2024, Reuters published an article entitled "Coinbase UK unit fined

for breaching financial crime requirements."  It stated that:

A Coinbase business in Britain has been fined for breaching a regulatory agreement to improve its defenses against financial crime, in the first sanction of its kind in the UK cryptoassets sector.

The Financial Conduct Authority (FCA) said on Thursday that CB Payments Limited (CBPL), a gateway for customers to trade cryptoassets within the global Coinbase Group, voluntarily agreed in October 2020 to make improvements to its financial crime controls after a visit by the watchdog.

The agreement stipulated that CBPL could not accept new high-risk customers until the issues were addressed.  The company, however, took on or provided e-money services to 13,416 such customers with nearly a third depositing a total of $24.9 million, the FCA said.

This money was used to execute multiple cryptoasset transactions via other Coinbase entities, totaling about $226 million, the watchdog said, adding that repeated breaches of the voluntary agreement went undiscovered for almost two years.

*      *      *

CBPL will pay a 3.5 million pound ($4.5 million) fine after qualifying for a 30% discount by agreeing to resolve the case.

223.    In response to these disclosures on July 25, 2024, the price of Coinbase common stock dropped 5.5% from its close of $245.06 per share on July 24, 2024, to $231.52 per share on July 25, 2024, on heavy trading volume of nearly 8.4 million shares.

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE

224.    At all relevant times, the market for Coinbase's securities was an efficient market for the following reasons, among others:

(a)    Coinbase securities met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Coinbase filed periodic reports with the SEC and the NASDAQ;

(c)    Coinbase regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Coinbase was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

225.    As a result of the foregoing, the market for Coinbase's securities promptly digested current information regarding Coinbase from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of Coinbase's securities during the Class Period suffered similar injury through their purchase of Coinbase's securities at artificially inflated prices. The *Basic Inc. v. Levinson*, 485. U.S. 224 (1988) presumption of reliance applies.

4904-0075-6784.v1

226.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Coinbase's stock traded in an efficient market, was liquid and traded with moderate to heavy volume during the Class Period;

- the Company's stock was traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Coinbase stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

227.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

228.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X.    INAPPLICABILITY OF SAFE HARBOR

229.    The federal statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  The statements alleged to be false and misleading herein were not forward-looking.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time they were made.  In addition, to the extent certain of the statements alleged to be false may be construed as forward looking, they were not

identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

230.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker knew that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Coinbase who knew that the statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

231.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who purchased or otherwise acquired Coinbase securities during the Class Period and were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any defendant has or had a controlling interest.

232.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, shares of Coinbase securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Coinbase or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

233.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

234.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

235.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period, misrepresented material facts about the business, operations and management of Coinbase;

(c)    whether certain of Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(d)    whether the prices of Coinbase securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(e)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

236.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    CLAIMS FOR RELIEF

### COUNT I

**For Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder
Against Coinbase, Armstrong, Haas, Choi, Chatterjee, Grewal, Jones and Rabenn**

237.    Plaintiffs repeat and reallege the allegations contained in ¶¶1-236 as if fully set forth herein.

238.    This Count is asserted pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, against Coinbase, Armstrong, Haas, Choi, Chatterjee, Grewal, Jones, and Rabenn, on behalf of Plaintiffs and the Class.

239.    During the Class Period, Defendants knowingly or recklessly engaged in a wrongful course of conduct pursuant to which they knowingly or recklessly made various untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

240.    Defendants' materially false and misleading statements and omissions were intended to, and, throughout the Class Period: (1) deceived the investing public, including Plaintiffs and other Class members, as alleged herein; (2) artificially inflated and maintained the market price of Coinbase securities; and (3) caused Plaintiffs and other members of the Class to purchase or otherwise acquire Coinbase securities at artificially inflated prices.

241.    Each of the Defendants participated directly or indirectly in the preparation and/or issuance of the Company's quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Coinbase securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material

- 93 -

adverse information and misrepresented the truth about Coinbase's operations and business prospects.

242.    By virtue of their positions at Coinbase, Defendants had actual knowledge of the false and misleading nature of the statements and material omissions alleged herein, and intended thereby to deceive Plaintiffs and the other members of the Class; or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, although such facts were readily available to Defendants.

243.    Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of Coinbase's conduct and operations.  As officers and/or directors of a publicly held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Coinbase's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Coinbase's securities was artificially inflated throughout the Class Period.

244.    In ignorance of the adverse facts concerning Coinbase's business operations, which Defendants concealed, Plaintiffs and the other members of the Class purchased or otherwise acquired Coinbase securities at artificially inflated prices, and in doing so, relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

245.    During the Class Period, shares of Coinbase securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class purchased or otherwise acquired Coinbase securities at prices artificially inflated by Defendants' wrongful conduct, relying on the

materially false and misleading statements described herein, which Coinbase and Defendants made, issued or caused to be disseminated, and/or relying upon the integrity of the market. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Coinbase securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Coinbase securities declined upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

246.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

247.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective Class Period purchases, acquisitions and/or sales of the Company's securities, as the truth about Coinbase's operations and business began to be disclosed to the investing public.

## COUNT II

### For Violations of §20(a) of the Exchange Act Against Coinbase, Armstrong, Haas, Choi, Chatterjee, Grewal, Jones and Rabenn

248.    Plaintiffs repeat and reallege the allegations contained in ¶¶1-247 as if fully set forth herein.

249.    This Count is asserted pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a), against Coinbase, Armstrong, Haas, Choi, Chatterjee, Grewal, Jones and Rabenn, on behalf of Plaintiffs and the Class.

250.    Defendants Armstrong, Haas, Choi, Chatterjee, Grewal, Jones and Rabenn each held executive and/or director positions and/or were beneficial owners of Coinbase.

- 95 -

251.    Defendants named in this Count directly and indirectly participated in the operation and management of Coinbase, and its business affairs.  Because of their senior positions, they knew the adverse non-public information about Coinbase's business practices described herein.

252.    As officers and/or directors of a publicly owned company, the Defendants named in this Count had a duty to disseminate accurate and truthful information with respect to Coinbase, and to correct promptly any public statements issued by Coinbase which had become materially false or misleading.

253.    Because of their positions of control and authority as directors and/or senior officers, Defendants named in this Count were able to, and did, control the contents of the various reports, press releases, and public filings which Coinbase disseminated in the marketplace during the Class Period concerning Coinbase's results of operations.

254.    Each of the Defendants named herein, therefore, acted as a controlling persons of Coinbase.  By reason of their senior management positions and/or being directors of Coinbase, each of the Defendants named herein had the power to direct the actions of, and exercised the same to cause, Coinbase to engage in the unlawful acts and conduct complained of herein.  They also exercised control over the general operations of Coinbase and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

255.    Coinbase had the power to control and influence the Individual Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations.  By virtue of the foregoing, Coinbase had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants, including the content of their public statements.

- 96 -

256.    By reason of the above conduct, Defendants named herein are liable pursuant to §20(a) of the Exchange Act.

## COUNT III

### For Violations of §20A Against Coinbase, Armstrong, Haas, Choi, Chatterjee, Grewal, and Jones

257.    Plaintiffs repeat and reallege the allegations contained in ¶¶1-256 as if fully set forth herein.

258.    This Count is brought pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1, against Coinbase, Armstrong, Haas, Choi, Chatterjee, and Jones, on behalf of Plaintiffs and the other members of the Class who traded contemporaneously with Defendants and were damaged thereby.

259.    Defendant Armstrong was in possession of material, non-public information about Coinbase throughout the Class Period.  As alleged above (¶¶192-193), Armstrong took advantage of the material, nonpublic information regarding Coinbase when he sold over 2.5 million shares of Coinbase stock, resulting in $559,868,311.19 in insider trading proceeds during the Class Period.

260.    Armstrong's transactions in Coinbase's securities were made contemporaneously with Plaintiffs' and Class members' purchases of Coinbase securities during the Class Period.  For instance, on April 14, 2021, Plaintiff Behnke purchased 810 shares of Coinbase common stock at a price of $382 per share and Plaintiff Galla purchased 2,500 shares at a price of $381 per share, contemporaneous with Armstrong's sale of 749,999 shares the same day.

261.    Defendant Haas was in possession of material, non-public information about Coinbase throughout the Class Period.  As alleged above (¶¶194-195), Haas took advantage of the material nonpublic information regarding Coinbase when she sold over 750,000 shares of Coinbase stock, resulting in $140,520,979 in insider trading proceeds during the Class Period.

262.    Haas's transactions in Coinbase's securities were made contemporaneously with Plaintiffs' and Class members' purchases of Coinbase securities during the Class Period.  For

instance, on April 14, 2021, Plaintiff Behnke purchased 810 shares of Coinbase common stock at a price of $382 per share and Plaintiff Galla purchased 2,500 shares at a price of $381 per share, contemporaneous with Haas's sale of 255,500 shares the same day.

263.    Defendant Choi was in possession of material, non-public information about Coinbase throughout the Class Period.  As alleged above (¶¶196-197), Choi took advantage of the material nonpublic information regarding Coinbase when she sold over 900,000 shares of Coinbase stock, resulting in $300,747,529 in insider trading proceeds during the Class Period.

264.    Choi's transactions in Coinbase's securities were made contemporaneously with Plaintiffs' and Class members' purchases of Coinbase securities during the Class Period.  For instance, on April 14, 2021, Plaintiff Behnke purchased 810 shares of Coinbase common stock at a price of $382 per share and Plaintiff Galla purchased 2,500 shares at a price of $381 per share, contemporaneous with Choi's sale of 602,158 shares the same day.

265.    Defendant Chatterjee was in possession of material, non-public information about Coinbase throughout the Class Period.  As alleged above (¶¶200-201), Chatterjee took advantage of the material nonpublic information regarding Coinbase when he sold 320,000 shares of Coinbase stock, resulting in $110,317,449 in insider trading proceeds during the Class Period.

266.    Chatterjee's transactions in Coinbase's securities were made contemporaneously with Plaintiffs' and Class members' purchases of Coinbase securities during the Class Period.  For instance, on April 14, 2021, Plaintiff Behnke purchased 810 shares of Coinbase common stock at a price of $382 per share and Plaintiff Galla purchased 2,500 shares at a price of $381 per share, contemporaneous with Chatterjee's sale of 160,000 shares the same day.

267.    Defendant Jones was in possession of material, non-public information about Coinbase throughout the Class Period.  As alleged above (¶¶202-203), Jones took advantage of the

material nonpublic information regarding Coinbase when she sold over 295,000 shares of Coinbase stock, resulting in $69,135,786 in insider trading proceeds during the Class Period.

268.    Jones's transactions in Coinbase's securities were made contemporaneously with Plaintiffs' and Class members' purchases of Coinbase securities during the Class Period.   For instance, on April 14, 2021, Plaintiff Behnke purchased 810 shares of Coinbase common stock at a price of $382 per share and Plaintiff Galla purchased 2,500 shares at a price of $381 per share, contemporaneous with Jones's sale of 110,000 shares the same day.

269.    As senior executives and/or Board members at Coinbase, Defendants owed a duty to Coinbase and its shareholders to maintain the material, nonpublic information in confidence and not trade on the basis of it.

270.    Defendant Coinbase is jointly and severally liable, under §20A(c) of the Exchange Act, for the damages caused by the insider trading described in this Count by defendants Armstrong, Haas, Choi, Chatterjee, and Jones, for having communicated, through its employees, directors, and agents, the material, nonpublic information that the defendants named in this Count possessed when making the insider trades described herein.

271.    All members of the Class who purchased shares of Coinbase securities in connection with the IPO and contemporaneously with sales by defendants Armstrong, Haas, Choi, Chatterjee, and Jones have suffered damages because: (i) they paid artificially inflated prices as a result of the Exchange Act violations alleged herein; and (ii) would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements and omissions.   At the time of the purchases of the securities, the fair and true value of the securities was substantially less than the price paid by these Class members.

272.    By reason of the above conduct, defendants Coinbase, Armstrong, Haas, Choi, Chatterjee, and Jones are liable pursuant to §20A of the Exchange Act.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the Class representatives of the Class, and Plaintiffs' Counsel as Class Counsel;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XIV.    JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  April 4, 2025             Respectfully submitted,

                                  ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                                  Jessica T. Shinnefield (admitted *pro hac vice*)
                                  Lucas F. Olts (admitted *pro hac vice*)
                                  Jack Abbey Gephart (admitted *pro hac vice*)
                                  Stephen Johnson (admitted *pro hac vice*)


                                        s/ Lucas F. Olts
                                  _____
                                        Lucas F. Olts

                                  655 West Broadway, Suite 1900
                                  San Diego, CA  92101
                                  Telephone:  619/231-1058
                                  619/231-7423 (fax)
                                  jshinnefield@@rgrdlaw.com
                                  lolts@rgrdlaw.com
                                  jgephart@rgrdlaw.com
                                  sjohnson@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
Evan J. Kaufman (admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
ekaufman@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

BERGER MONTAGUE PC
Michael Dell'Angelo - PA Attorney I.D. #80910
Andrew D. Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone:  215/875-3000

- 101 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 4, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Lucas F. Olts
Lucas F. Olts

ROBBINS GELLER RUDMAN
     & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  lolts@rgrdlaw.com

# Mailing Information for a Case 2:24-cv-04850-JHS CASTLE v. COINBASE GLOBAL, INC. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **MICHAEL ALBERT**
  malbert@rgrdlaw.com

- **Lee Albert**
  lalbert@glancylaw.com,lee-albert-5832@ecf.pacerpro.com,info@glancylaw.com

- **MICHAEL C. DELL'ANGELO**
  mdellangelo@bm.net,eyork@bm.net,courtmail@bm.net,csimon@bm.net,jgionnette@bm.net

- **KENNETH P. DOLITSKY**
  kdolitsky@rgrdlaw.com

- **ALEXANDER C. DRYLEWSKI**
  ALEXANDER.DRYLEWSKI@SKADDEN.COM,alexander-drylewski-0847@ecf.pacerpro.com

- **EMILY FINESTONE**
  efinestone@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com

- **Lara A. Flath**
  lara.flath@skadden.com,lara-flath-9033@ecf.pacerpro.com

- **JACK A. GEPHART**
  jgephart@rgrdlaw.com

- **JACOB A. GOLDBERG**
  jgoldberg@rosenlegal.com,etexidor@rosenlegal.com

- **STEPHEN JOHNSON**
  sjohnson@rgrdlaw.com

- **EVAN J. KAUFMAN**
  ekaufman@rgrdlaw.com

- **PHILLIP C. KIM**
  pkim@rosenlegal.com,pkrosenlaw@ecf.courtdrive.com

- **LUCAS F. OLTS**
  lolts@rgrdlaw.com,e_file_sd@rgrdlaw.com,avelasquez@rgrdlaw.com

- **JESSICA T. SHINNEFIELD**
  jshinnefield@rgrdlaw.com

- **MEREDITH C SLAWE**
  meredith.slawe@skadden.com,andrea.morin@skadden.com,Nick.Peiffer@skadden.com,meredith-slawe-0580@ecf.pacerpro.com,gerri.powell@skadden.com,Lara.Flath@skadden.com,DLMLCNYC@skadden.com,Alexander.Drylewski@skadden.com

- **Olivia Simkins**
  osimkins@rosenlegal.com,osimkins@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)